# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| The Marcellus Shale Coalition, | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 573 M.D. 2016 |
| | : | Argued: October 17, 2018 |
| Department of Environmental | : | |
| Protection of the Commonwealth | : | |
| of Pennsylvania and Environmental | : | |
| Quality Board of the Commonwealth | : | |
| of Pennsylvania, | : | |
| Respondents | : | |

**BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge**
**HONORABLE RENÉE COHN JUBELIRER, Judge**
**HONORABLE P. KEVIN BROBSON, Judge**
**HONORABLE PATRICIA A. McCULLOUGH, Judge**
**HONORABLE ANNE E. COVEY, Judge**
**HONORABLE CHRISTINE FIZZANO CANNON, Judge**
**HONORABLE ELLEN CEISLER, Judge**

**OPINION BY JUDGE BROBSON**          **FILED:  July 22, 2019**

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................2

II.    PROCEDURAL HISTORY .........................................................................3

III.   GOVERNING LEGAL STANDARDS ........................................................5

     A.     Summary Relief.................................................................................5

     B.     Declaratory Relief ............................................................................6

     C.     *Tire Jockey* ......................................................................................7

IV.    ANALYSIS OF CROSS-APPLICATIONS....................................................9

     A.     Area of Review (Count II)—Agencies' Application ...........................9

     B.     On-Site Processing (Count III)—Cross-Applications.......................23

     C.     Well Development and Centralized Impoundments (Count IV)—Agencies' Application ...................................................27

          1.      Well Development Impoundments ...........................................27

          2.      Centralized Impoundments .......................................................35

     D.    Site Restoration (Count V)—Cross-Applications..............................44

          1. Authority—Subsections (a) and (b) ...............................................49

          2. Vagueness—Subsection (b) .........................................................58

          3. Authority—Subsection (d) ............................................................63

          4. Compliance with Procedures.......................................................69

          5. Reasonableness.........................................................................75

     E.    Spill Remediation (Count VI)—Cross-Applications ..........................76

     F.    Waste Reporting (Count VII)—Agencies' Application......................80

V.    CONCLUSION..............................................................................................86

## I.   INTRODUCTION

The Marcellus Shale Coalition (Coalition) initiated this original jurisdiction action, seeking pre-enforcement review of regulations related to unconventional well operations found in Title 25, Chapter 78a of the Pennsylvania Code (Unconventional Well Regulations), 25 Pa. Code Ch. 78a.[1]  Presently before the Court are cross-applications for partial summary relief.  The Coalition seeks summary relief in its favor on Counts III (on-site processing regulation), V (site restoration regulation), and VI (spill remediation regulation) of its Petition for Review in the Nature of a Complaint Seeking Declaratory and Injunctive Relief (Petition).  Respondents the Department of Environmental Protection (Department)

---

[1] An unconventional well is "[a] bore hole drilled or being drilled for the purpose of or to be used for the production of natural gas from an unconventional formation." 25 Pa. Code § 78a.1 (definitions).  Unconventional formations include geologic shale formations from which natural gas cannot generally be economically extracted except through the use of hydraulic fracturing.  *Id.*

and the Environmental Quality Board (EQB) (collectively, Agencies)[2] seek summary relief in their favor on Counts II (area of review regulation), III, IV (well development impoundment and centralized impoundment regulations), V, VI, and VII (waste reporting regulation).

## II. PROCEDURAL HISTORY

Shortly after the Unconventional Well Regulations became effective, the Coalition initiated this action in our original jurisdiction. The Petition is organized into seven counts, each of which addresses challenges to a particular regulation. Contemporaneous with the Petition, the Coalition applied for preliminary injunctive relief, seeking an order enjoining enforcement of the challenged regulations pending disposition of the merits. Following an evidentiary hearing, this Court granted in part and denied in part the Coalition's application in an unreported, single-judge decision. *See Marcellus Shale Coal. v. Dep't of Envtl. Prot.* (Pa. Cmwlth., No. 573 M.D. 2016, filed Nov. 8, 2016) (*MSC I*). Specifically, the Court granted some form of interim relief with respect to Counts I, II, IV, and V but denied interim relief with respect to the remaining counts of the Petition.

---

[2] In *Arsenal Coal Co. v. Department of Environmental Resources*, 477 A.2d 1333 (Pa. 1984), the Pennsylvania Supreme Court explained:

> The environmental law of this Commonwealth is administratively regulated by three separate bodies. The [EQB] has as its primary purpose and power to formulate, adopt and promulgate rules and regulations which become the rules and regulations of the Department of Environmental Resources [(now the Department of Environmental Protection)], which then has the duty of enforcing the regulations. The third body, the Environmental Hearing Board[,] is empowered to review orders, permits, licenses and decisions of the Department of Environmental Resources in its enforcement role.

*Arsenal Coal*, 477 A.2d at 1336 n.3 (citation omitted).

3

The Agencies appealed that decision to the Pennsylvania Supreme Court. The Supreme Court affirmed in part and reversed in part. *See Marcellus Shale Coal. v. Dep't of Envtl. Prot.*, 185 A.3d 985 (Pa. 2018) (*MSC II*). Specifically, the Supreme Court affirmed the grant of preliminary injunctive relief with respect to Counts I and II. With respect to Count IV, the Supreme Court affirmed the grant of preliminary injunctive relief with respect to the regulation relating to centralized impoundments, but it reversed the grant of preliminary injunctive relief with respect to the regulation relating to well development impoundments.[3] With respect to Count V of the Petition, the Supreme Court reversed the grant of preliminary injunctive relief.

We directed the parties to file dispositive motions by March 14, 2018. On August 31, 2017, the Coalition filed an application for summary relief directed to Count I of the Petition. Count I challenged Sections 78a.15(f) and (g) and certain definitions found in Section 78a.1 of the Unconventional Well Regulations, referred to generally as the public resource regulations. In a reported en banc Opinion and Order, this Court granted in part and denied in part the Coalition's application for summary relief with respect to Count I. *Marcellus Shale Coal. v. Dep't of Envtl. Prot.*, 193 A.3d 447 (Pa. Cmwlth.) (en banc) (*MSC III*), *appeal quashed*, 198 A.3d 330 (Pa. 2018). In so doing, we declared void and unenforceable certain definitions found in Section 78a.1. We also declared unconstitutional and unenforceable Section 78a.15(g)'s requirement that the Department, as part of its review of a well permit application, consider comments and recommendations

---

[3] Centralized impoundments store waste water generated from drilling activities. (Agencies' Br. in Supp. at Ex. E.) Well development impoundments, by contrast, store "surface water, fresh groundwater[,] and other fluids approved by the Department" to be used in drilling operations. *See* 25 Pa. Code §§ 78a.1 (definitions), 78a.59c (centralized impoundment regulation).

submitted by municipalities. We were constrained to do so because the Pennsylvania Supreme Court in *Robinson Township v. Commonwealth*, 83 A.3d 901 (Pa. 2013) (*Robinson Twp. II*), declared unconstitutional and unenforceable the statutory authorization for that provision—Section 3215(d) of Act 13 of 2012 (Act 13), 58 Pa. C.S. § 3215(d).[4] *Robinson Twp. II*, 83 A.3d at 984-85, 1000. We denied the Coalition's application for summary relief as to Count I in all other respects. *MSC III*, 193 A.3d at 486.

On March 14, 2018, the parties filed the cross-applications for summary relief that are presently before the Court. The parties have each filed responses and briefs in support of their respective positions. The Sierra Club, Damascus Citizens for Sustainability, and Earthworks, as friends of the Court, filed a brief in opposition to the Coalition's application for summary relief. The Court, sitting en banc, heard oral argument on the cross-applications on October 17, 2018. The cross-applications are now ripe for disposition.

## III.    GOVERNING LEGAL STANDARDS

### A.    Summary Relief

Applications for summary relief addressed to this Court's original or appellate jurisdiction are authorized under Rule 1532(b) of the Pennsylvania Rules of Appellate Procedure, which provides: "At any time after the filing of a petition for review in an appellate or original jurisdiction matter the court may on application enter judgment *if the right of the applicant thereto is clear*." (Emphasis added.) Summary relief is similar to summary judgment under the Pennsylvania Rules of Civil Procedure, in that the requested relief is only appropriate where there are no disputed issues of material fact and it is clear that the applicant is entitled to the

---

[4] Act 13 is codified at 58 Pa. C.S. §§ 2301-3504.

requested relief under the law. *See Scarnati v. Wolf*, 173 A.3d 1110, 1118 (Pa. 2017). Moreover, we review the record in the light most favorable to the nonmoving party, resolving all doubts as to the existence of disputed material facts against the moving party. *Id.*

## B. Declaratory Relief

The Coalition seeks relief under the Declaratory Judgments Act.[5] A declaratory judgment is only appropriate to resolve a real controversy. *Gulnac by Gulnac v. S. Butler Sch. Dist.*, 587 A.2d 699, 701 (Pa. 1991). As the Pennsylvania Supreme Court explained in *Gulnac*: "A declaratory judgment must not be employed to determine rights in anticipation of events which may never occur or for consideration of moot cases or as a medium for the rendition of an advisory opinion which may prove to be purely academic." *Id.* The decision to grant or deny declaratory relief lies "within the sound discretion of [the] court of original jurisdiction." *Id.*

We note as well that this matter is a pre-enforcement challenge to the Unconventional Well Regulations. Generally, courts should not prematurely entangle themselves in abstract disagreements over the meaning of an agency regulation. Instead, such disagreements are better resolved first through the agency adjudicatory process as a matter of enforcement. *See Bayada Nurses, Inc. v. Dep't of Labor & Indus.*, 8 A.3d 866, 875 (Pa. 2010) (citing *Arsenal Coal*, 477 A.2d 1333); *see also Tire Jockey Serv., Inc. v. Dep't of Envtl. Res.*, 915 A.2d 1165, 1187 (Pa. 2007) (ruling on challenge to regulation in context of appeal from enforcement action before Environmental Hearing Board). Where, however, the impact of a regulation on an industry is direct and immediate, pre-enforcement judicial review

---

[5] 42 Pa. C.S. §§ 7531-7541.

is appropriate. *Bayada Nurses*, 8 A.3d at 875-76; *see also EQT Prod. Co. v. Dep't of Envtl. Prot.*, 130 A.3d 752, 759 (Pa. 2015) (*EQT I*) (holding pre-enforcement review of dispute over statutes establishing penalty exposure under The Clean Streams Law[6] was appropriate because Department's threat of multi-million dollar liability was direct, immediate, and substantial).

## C. *Tire Jockey*

"[W]hen an agency adopts a regulation pursuant to its legislative [rulemaking] power, . . . it is valid and binding upon courts as a statute so long as it is (a) adopted within the agency's granted power, (b) issued pursuant to proper procedure, and (c) reasonable." *Tire Jockey*, 915 A.2d at 1186. The challenged regulations in this matter are legislative rules and thus may be challenged on any or all of these three grounds.[7] *MSC II*, 185 A.3d at 995.

To determine whether a regulation is adopted within an agency's granted power, we look for statutory language authorizing the agency to promulgate the legislative rule and examine that language to determine whether the rule falls within the grant of authority. *See Slippery Rock Area Sch. Dist. v. Unemployment Comp. Bd. of Review*, 983 A.2d 1231, 1239-41 (Pa. 2009). The legislature's delegation must be clear and unmistakable. *Eagle Envtl. II, L.P. v. Dep't of Envtl. Prot.*, 884 A.2d 867, 878 (Pa. 2005). In performing this analysis, our Supreme Court has recognized the importance of substantive rulemaking as a practice widely used in administrative law, which we should uphold "whenever the statutory delegation can reasonably be construed to authorize it." *Id.* at 877. When considering, then,

---

[6] Act of June 22, 1937, P.L. 1987, *as amended*, 35 P.S. §§ 691.1-.1001.

[7] Legislative rules "establish a substantive rule creating a controlling standard of conduct." *Borough of Pottstown v. Pa. Mun. Ret. Bd.*, 712 A.2d 741, 743 (Pa. 1998) (*Pottstown*). Interpretative rules, by contrast, merely construe a statute and do not expand upon the statute's terms. *Id.*

whether the agency has the authority to enact a particular substantive rule, we must consider both the letter of the statutory delegation to create that rule as well as "the purpose of the statute and its reasonable effect." *Id.* We also consider as part of this analysis whether the regulation is consistent with the enabling statute, for "[c]learly, the legislature would not authorize agencies to adopt . . . regulations inconsistent with the . . . enabling statutes." *Slippery Rock*, 983 A.2d at 1241. When, therefore, a regulation presents "an actual conflict with the statute," we cannot reasonably understand the regulation to be within the agency's ambit of authority, and the statute must prevail. *AMP Inc. v. Cmwlth.*, 814 A.2d 782, 786 (Pa. Cmwlth. 2002), *aff'd*, 852 A.2d 1161 (Pa. 2004); *see also Slippery Rock*, 983 A.2d at 1241 ("[A]ll regulations, whether legislative or interpretive[,] 'must be consistent with the statute under which they were promulgated.'" (quoting *Popowsky v. Pa. Pub. Util. Comm'n*, 910 A.2d 38, 52 (Pa. 2006)).

As for the second *Tire Jockey* standard, we examine whether the agency promulgating the regulation followed the proper procedures. Generally, in promulgating regulations an agency must comply with any special procedures set forth in its enabling legislation as well as the procedures set forth in the Commonwealth Documents Law,[8] the Commonwealth Attorneys Act,[9] and the Regulatory Review Act.[10] *See Germantown Cab Co. v. Phila. Parking Auth.*, 993 A.2d 933, 937 (Pa. Cmwlth. 2010) (en banc). "A regulation not promulgated in accordance with the statutory requirements will be declared a nullity." *Id.*

---

[8] Act of July 31, 1968, P.L. 769, *as amended*, 45 P.S. §§ 1102-1602, and 45 Pa. C.S. §§ 501-907, which, collectively, are known as the "Commonwealth Documents Law." This was the official short title of the 1968 enactment. *See* Section 101 of the Act of July 31, 1968, P.L. 769.

[9] Act of October 15, 1980, P.L. 950, *as amended*, 71 P.S. §§ 732-101 to -506.

[10] Act of June 25, 1982, P.L. 633, *as amended*, 71 P.S. §§ 745.1-.15.

As to the final *Tire Jockey* standard, we note that where legislative rules are adopted within the agency's granted power and issued pursuant to proper procedure, they enjoy a presumption of reasonableness. *Pottstown*, 712 A.2d at 744; *Pa. Ass'n of Rehab. Facilities v. Foster*, 624 A.2d 270, 273 (Pa. Cmwlth. 1993). In considering a reasonableness challenge, we will not substitute our judgment for that of the agency:

> "[I]t is not enough that [the agency's regulation] shall appear to be unwise or burdensome or inferior to another. Error or unwisdom is not equivalent to abuse. What has been ordered must appear to be so entirely at odds with fundamental principles as to be the expression of a whim rather than an exercise of judgment."

*Slippery Rock,* 983 A.2d at 1242 (quoting *Pa. Human Relations Comm'n v. Uniontown Area Sch. Dist.*, 313 A.2d 156, 169 (Pa. 1973) (opinion announcing the judgment of the court)) (second alteration in original).

## IV.  ANALYSIS OF CROSS-APPLICATIONS

### A.  Area of Review (Count II)—Agencies' Application

The Agencies move for partial summary relief on Count II of the Petition, contending that the Coalition cannot prevail on its claim that the Agencies lack the authority to enact Sections 78a.52a and 78a.73(c) and (d) of the Unconventional Well Regulations,[11] referred to in this matter as the area of review regulations.

Section 78a.52a of the Unconventional Well Regulations requires a well operator to identify all active, inactive, orphan, abandoned, and plugged and abandoned wells[12] that have a well bore path within 1,000 feet of the operator's well

---

[11] 25 Pa. Code §§ 78a.52a, 78a.73(c)-(d).

[12] Section 3203 of Act 13, 58 Pa. C.S. § 3203, defines the following terms:

bore, measured horizontally from the operator's vertical well bore and from the surface above the entire length of any horizontal well bore.[13] The operator must then

---

**"Abandoned well."** Any of the following:

(1) A well:

(i) that has not been used to produce, extract or inject any gas, petroleum or other liquid within the preceding 12 months;

(ii) for which equipment necessary for production, extraction or injection has been removed; or

(iii) considered dry and not equipped for production within 60 days after drilling, redrilling or deepening.

(2) The term does not include wells granted inactive status.

. . . .

**"Inactivate."** To shut off the vertical movement of gas in a gas storage well by means of a temporary plug or other suitable device or by injecting bentonitic mud or other equally nonporous material into the well.

. . . .

**"Orphan well."** A well abandoned prior to April 18, 1985, that has not been affected or operated by the present owner or operator and from which the present owner, operator or lessee has received no economic benefit other than as a landowner or recipient of a royalty interest from the well.

[13] Section 78a.52a of the Unconventional Well Regulations provides:

(a) The operator shall identify the surface and bottom hole locations of any of the following having well bore paths within 1,000 feet measured horizontally from the vertical well bore and 1,000 feet measured from the surface above the entire length of a horizontal well bore:

(1) Active wells.

(2) Inactive wells.

(3) Orphan wells.

(4) Abandoned wells.

(5) Plugged and abandoned wells.

(b) Identification of wells listed in subsection (a) must be accomplished by the following:

10

submit a report to the Department that summarizes its review, including, *inter alia*, a monitoring plan.  25 Pa. Code § 78a.52a(c).

------

(1) Conducting a review of the Department's well databases and other available well databases.

(2) Conducting a review of historical sources of information, such as applicable farm line maps, where accessible.

(3) Submitting a questionnaire by certified mail on forms provided by the Department to landowners whose property is within the area identified in subsection (a) regarding the precise location of wells on their property.

(c) The operator shall submit a report summarizing the review, including:

(1) A plat showing the location and GPS coordinates of all wells identified under subsection (b).

(2) Proof that the operator submitted questionnaires under subsection (b)(3).

(3) A monitoring plan for wells required to be monitored under [25 Pa. Code] § 78a.73(c) (relating to general provision for well construction and operation), including the methods the operator will employ to monitor these wells.

(4) To the extent that information is available, the true vertical depth of identified wells.

(5) The sources of the information provided for identified wells.

(6) To the extent that information is available, surface evidence of failed well integrity for any identified well.

(d) The operator shall submit the report required under subsection (c) to the Department at least 30 days prior to the start of drilling the well or at the time the permit application is submitted if the operator plans to start drilling the well less than 30 days from the date of permit issuance. The report shall be provided to the Department electronically through the Department's web site.

(e) The Department may require other information necessary to review the report submitted under subsection (c).  The Department may make a determination that additional measures are needed, on a case-by-case basis, to ensure protection of waters of the Commonwealth.

11

Sections 78a.73(c) and (d) of the Unconventional Well Regulations impose advance notice, visual monitoring, and remediation obligations in the event that stimulation of a well by hydraulic fracturing, or "fracking," causes a communication incident or alteration of one of the wells identified in the area of review survey. These obligations purportedly address the concern that gas, oil, brine, or fluids used in fracking a particular well may migrate to other wells nearby, rise to the surface, and contaminate groundwater.[14] In the event of such an incident or alteration, the operator of the stimulated well must notify the Department of the incident, immediately cease well stimulation activities, and take steps to protect the waters of the Commonwealth from pollution. The well operator may not resume well stimulation activities without the permission of the Department. Finally, where well stimulation activities cause an alteration to an orphan, abandoned, or plugged and abandoned well, the operator of the stimulated well is obligated to plug the altered well or adopt it and place it into production.[15]

---

[14] *See* 25 Pa. Code § 78a.73(b) ("The operator shall prevent gas, oil, brine, completion and servicing fluids, and any other fluids or materials from below the casing seat from entering fresh groundwater, and shall otherwise prevent pollution or diminution of fresh groundwater.").

[15] Sections 78a.73(c) and (d) of the Unconventional Well Regulations provide:

> (c) The operators of active, inactive, abandoned, and plugged and abandoned wells identified as part of an area of review survey conducted under [25 Pa. Code] § 78a.52a (relating to area of review) that likely penetrate within 1,500 feet measured vertically from the stimulation perforations, if known, shall be notified. Notice shall be provided at least 30 days prior to the start of drilling the well or at the time the permit application is submitted to the Department if the start of drilling is planned less than 30 days from the date of permit issuance. Orphan wells, abandoned wells, and plugged and abandoned wells identified as part of an area of review survey conducted under [25 Pa. Code] § 78a.52a that either penetrate within 1,500 feet measured vertically from the stimulation perforations or have an unknown true vertical depth shall be visually monitored during stimulation activities. The operator shall immediately notify the Department of any

In its Petition, the Coalition articulates several challenges to the area of review regulations. (Petition ¶ 49(a)-(f).) First, the Coalition generally contends that there is no legal authority for the new "area of review" requirements. The Coalition further argues that requiring someone other than the well owner to plug an orphan, abandoned, or plugged and abandoned well conflicts with Section 3220 of Act 13, 58 Pa. C.S. § 3220, which imposes plugging requirements only on the well owner or operator. The Coalition also contends that the regulations are void for vagueness, citing the Department's intent to issue a follow-up technical guidance document. The Coalition argues that Section 78a.52a(e) of the Unconventional Well Regulations, 25 Pa. Code § 78a.52a(e), should be stricken as unlawful and unreasonable, as the provision grants the Department unlimited authority and discretion to impose additional requirements on well operators without any limiting principle, including the potential to prohibit hydraulic fracturing entirely. The Coalition contends that Section 78a.73(c) of the Unconventional Well Regulations is unlawful and unreasonable to the extent it imposes a duty on well operators to monitor orphan, abandoned, and plugged and abandoned wells simply because the

change to a well being monitored, of any treatment pressure or volume changes indicative of abnormal fracture propagation at the well being stimulated or if otherwise made aware of a confirmed well communication incident associated with their stimulation activities. Notice shall be provided to the Department electronically through the Department's web site. In an event such as this, the operator shall cease stimulating the well that is the subject of the area of review survey and take action to prevent pollution of waters of the Commonwealth or discharges to the surface. The operator may not resume stimulation of the well that is the subject of the area of review survey without Department approval.

(d) An operator that alters an orphan well, or an abandoned well or plugged and abandoned well by hydraulic fracturing shall plug the altered well in accordance with this chapter, or the operator may adopt the altered well and place it into production.

13

true vertical depth of those wells is unknown. Finally, the Coalition contends that the monitoring and remediation provisions would require a well operator to enter illegally onto property owned and controlled by others—*i.e.*, to trespass.

The Agencies seek summary relief only with respect to the Coalition's lack of authority challenge under the first *Tire Jockey* standard. In support, the Agencies argue first that the area of review regulations fall within the Agencies' grant of rulemaking authority under The Clean Streams Law. Specifically, they direct us to Section 402(a) of The Clean Streams Law, 35 P.S. § 691.402(a), which provides the Department with authority to deal with potential pollution of the waters of the Commonwealth. Section 402(a) of The Clean Streams Law provides, in relevant part:

> Whenever the [D]epartment finds that *any activity*, not otherwise requiring a permit under this act, including but not limited to the impounding, handling, storage, transportation, processing or disposing of materials or substances, creates a danger of pollution of the waters of the Commonwealth or that regulation of the activity is necessary to avoid such pollution, *the [D]epartment . . . may otherwise establish the conditions under which such activity shall be conducted . . . .*

(Emphasis added.) The Agencies tether this authority to the general authority given the Department by Section 5(b)(1) of The Clean Streams Law, added by the Act of July 31, 1970, P.L. 653, 35 P.S. § 691.5(b)(1), to "[f]ormulate, adopt, promulgate and repeal such rules and regulations . . . as are necessary to implement the provisions of this act." The Agencies argue that the area of review regulations address the potential for pollution posed by fracking activities in proximity to other oil and gas wells, which they argue falls within this grant of authority under The Clean Streams Law.

14

The Agencies also claim authority for the area of review regulations in Sections 3202(1), 3217, 3259, and 3274 of Act 13. *See* 58 Pa. C.S. §§ 3202(1) (noting purpose of Act 13 is to "[p]ermit optimal development of oil and gas resources of the Commonwealth consistent with protection of the health, safety, environment and property of Pennsylvania citizens"), 3217, 3259 (making unlawful, *inter alia*, drilling for or production of oil and gas "in any manner as to . . . affect public health, safety, welfare or the environment"), 3274 (generally authorizing EQB to "promulgate regulations to implement this chapter"). Of these provisions, Section 3217 of Act 13 is the one that most specifically addresses concerns about the potential harm that unconventional well operations may have on waters of the Commonwealth. It provides, in relevant part:

> **(a) General Rule.**—To aid in protection of fresh groundwater, well operators shall control and dispose of brines produced from the drilling, alteration or operation of an oil or gas well in a manner consistent with . . . The Clean Streams Law, or any regulation promulgated under The Clean Streams Law.
>
> **(b) Casing.**—To prevent migration of gas or fluids into sources of fresh groundwater and pollution or diminution of fresh groundwater, a string or strings of casing shall be run and permanently cemented in each well drilled through the fresh water-bearing strata to a depth and in a manner prescribed by regulation by the [D]epartment.

58 Pa. C.S. § 3217. The Agencies posit:

> The Area of Review Regulations are within the granted authority to promulgate regulations (Section 3274) to protect the public and the environment from potential harms from drilling activity (Section 3259) that can result from the migration of fluids or gases generated during development of a new unconventional well through the ground and groundwater to existing wells (Section 3217).

15

(Agencies' Br. in Supp. at 27.)

Turning to specific portions of the area of review regulations, the Agencies seek summary relief with respect to the Coalition's challenge to Section 78a.52a(e) of the Unconventional Well Regulations. They reject the Coalition's contention that the regulation grants any new power to the Department. Instead, the Agencies argue that the regulation is interpretive, not legislative, as it merely restates and clarifies the authority afforded the Department to request additional information from a permit applicant and impose additional safeguards on an ad hoc basis. As an interpretive regulation, the Agencies contend that Section 78a.52a(e) is "inherently valid," citing the Pennsylvania Supreme Court's decision in *Pottstown*.[16] Generally, the Agencies cite the same statutory provisions in The Clean Streams Law and Act 13 set forth above. Specifically, the Agencies also cite Section 3211(b)(1) of Act 13, 58 Pa. C.S. § 3211(b)(1), which addresses the contents of a plat that applicants must submit with their permit application.[17] The

---

[16] In *Pottstown*, the Pennsylvania Supreme Court explained the difference between legislative rules, which establish a controlling standard of conduct, and interpretive rules, which merely construe, without expanding, the terms of a statute. With respect to interpretive rules in particular, the Supreme Court opined:

> Agencies also devise rules and regulations that do not in themselves establish binding standards of conduct. Such pronouncements are valid as "interpretive rules" and need not be promulgated in accordance with the Commonwealth Documents Law to the extent that they merely construe a statute and do not improperly expand upon its terms. To be viable, an interpretive rule must genuinely track the meaning of the underlying statute, rather than establish an extrinsic substantive standard.

*Pottstown*, 712 A.2d at 743.

[17] Section 3211(b)(1) of Act 13 provides:

> The permit application shall be accompanied by a plat prepared by a competent engineer or a competent surveyor, on forms furnished by the [D]epartment, showing the political subdivision and county in which the tract of

16

Agencies argue that these statutory provisions provide the Department with case-by-case authority to request additional information from a permittee and to impose additional requirements on a permittee where warranted to ensure that the proposed fracking activity poses no threat to the waters of the Commonwealth and will not adversely affect public health or safety or the environment.

Next, the Agencies address the Coalition's challenge to Sections 78a.73(c) and (d) of the Unconventional Well Regulations, specifically the Coalition's claim that the provisions require well owners and operators to trespass and to compel unconventional well owners and operators to plug or adopt wells that do not belong to them. Citing again the provisions of The Clean Streams Law and Act 13 set forth above, the Agencies argue that they enjoy broad authority to protect the public from the impact of hydraulic fracturing. Specifically, they cite Section 316 of The Clean Streams Law, added by the Act of August 23, 1965, P.L. 372, 35 P.S. § 691.316, which provides:

---

land upon which the well to be drilled, operated or altered is located; a list of municipalities adjacent to the well site; the name of the surface landowner of record and lessor; the name of all surface landowners and water purveyors whose water supplies are within 1,000 feet of the proposed well location or, in the case of an unconventional well, within 3,000 feet from the vertical well bore; the name of the owner of record or operator of all known underlying workable coal seams; the acreage in the tract to be drilled; the proposed location of the well determined by survey, courses and distances of the location from two or more permanent identifiable points or landmarks on the tract boundary corners; the proposed angle and direction of the well if the well is to be deviated substantially from a vertical course; the number or other identification to be given the well; the workable coal seams underlying the tract of land upon which the well is to be drilled or altered and which shall be cased off under [S]ection 3217 [of Act 13] (relating to protection of fresh groundwater and casing requirements); *and any other information needed by the* [D]*epartment to administer this chapter.*

(Emphasis added.)

> Whenever the [D]epartment finds that pollution or a danger of pollution is resulting from a condition which exists on land in the Commonwealth the [D]epartment may order the landowner or occupier to correct the condition in a manner satisfactory to the [D]epartment or it may order such owner or occupier to allow a mine operator or other person or agency of the Commonwealth access to the land to take such action.

The Agencies also cite a basket of other statutes and regulations,[18] which generally require a person that causes pollution to remediate that pollution regardless of where the pollution lies—*i.e.*, even if the pollution is on someone else's property.

Finally, the Agencies direct the Court to two decisions from the Pennsylvania Supreme Court. The first, *Commonwealth v. Harmer Coal Co.*, 306 A.2d 308 (Pa. 1973), *appeal dismissed*, 415 U.S. 903 (1974), involved permits under The Clean Streams Law to discharge acid mine drainage into a surface water of the Commonwealth. The applicant in that case maintained that it did not need to treat polluted water that migrated into its mine from a nearby inactive mine or polluted water that remained in the nearby inactive mine that needed to be pumped out to shore up the stability of the barrier between the inactive mine and the applicant's mine. The Supreme Court rejected that contention, concluding that the applicable statutory language required the operator of a mine to treat all pollution discharged from the mine and any adjacent mine as needed to operate the subject mine. *Harmer Coal*, 306 A.2d at 321.

The Agencies cite the second decision, *Chartiers Block Coal Co. v. Mellon*, 25 A. 597 (Pa. 1893), solely for the proposition that the owners of a severed

---

[18] *See* Land Recycling and Environmental Remediation Standards Act, Act of May 19, 1995, P.L. 4, 35 P.S. §§ 6026.101-.908 (Act 2); Hazardous Sites Cleanup Act, Act of October 18, 1988, P.L. 756, 35 P.S. §§ 6020.101-.1305; 25 Pa. Code §§ 91.33, 250.312(h), 250.410(c).

18

mineral estate have an implied right of entry to the surface estate to access and remove their subsurface asset. The Agencies cite other decisions for the proposition that property owners must allow access to property to abate nuisances. *See Del. Div. Canal Co. v. Cmwlth.*, 60 Pa. 367 (1869); *Ryan v. Dep't of Envtl. Res.*, 373 A.2d 475 (Pa. Cmwlth. 1977) (en banc). The Agencies also cite Section 610 of The Clean Streams Law, 35 P.S. § 691.610, and Section 602(a) of the Solid Waste Management Act (SWMA),[19] which the Agencies contend authorize the Department to require property owners to grant access to their properties to remediate pollution.

In response, the Coalition mostly challenges the scope, justification, and reasonableness of the area of review regulations, particularly Section 78a.73(c), which requires a well operator to notify the Department immediately and cease stimulating a well in the event of a communication incident or alteration. The Coalition also strongly questions the value of imposing any identification and monitoring requirement with respect to "shallow wells"—*i.e.*, wells with a total depth insufficient to reach the Marcellus shale formation targeted by the unconventional well industry. Citing discovery material, the Coalition argues that the Department has no record of any communication incidents between an unconventional well and a shallow well. Moreover, the Department is aware of only nine communication incidents relating to fracking of unconventional wells, only three of which involved a conventional well. In response to the Coalition's discovery requests, the Department provided no details of alleged environmental impacts resulting from those three incidents. The Coalition presses that three communication incidents through the course of stimulating 10,000 unconventional wells "cannot and does not provide the facts needed for this Court to conclude that

---

[19] Act of July 7, 1980, P.L. 308, *as amended*, 35 P.S. § 6018.602(a).

19

the [area of review] regulation prevents pollution or ensures safe operations." (Coalition Br. in Opp'n at 18.) Moreover, the Coalition, citing testimony adduced during discovery from the Agencies' proposed witness on Count II, Seth Polepko, emphasizes that the area of review regulation will not prevent communication incidents, which are few and with no verified environmental impact. As summarized by the Coalition: "The [area of review] regulation is thus a costly and elaborate solution in search of a problem." (*Id.* at 19.) In short, the Coalition argues that the area of review regulations impose excessive obligations on the industry at a substantial cost with no discernable benefit.

The Coalition also argues that the Agencies have failed to provide any statutory authority for the portions of the area of review regulations that require well operators to enter, inspect, and monitor wells on the lands of others and over which the stimulating well operator has no control. Moreover, the Coalition urges the Court to reject the Agencies' general citations to Act 13 and The Clean Streams Law as authority for the area of review regulations specifically. Finally, the Coalition emphasizes the fact that, even if the Court strikes the area of review regulations, the Department retains authority under The Clean Streams Law and related existing regulations, 25 Pa. Code Ch. 91, to address any impacts to waters of the Commonwealth from communication incidents as circumstances warrant, just as it addressed the nine communication incidents that occurred prior to adoption of the area of review regulations.

Initially, we note that the only question before the Court on summary relief is whether the area of review regulations fall within a grant of authority by the General Assembly to the Agencies, in particular the EQB. For purposes, then, of this analysis, we discount many of the Coalition's arguments in opposition to the

20

Agencies' application for summary relief, which are addressed to the reasonableness of the area of review regulations.

In *MSC I*, this Court analyzed the question of the Agencies' authority to promulgate the area of review regulations in the context of the Coalition's request for preliminary injunctive relief. With slight modification, particularly in light of the Pennsylvania Supreme Court's decision in *MSC II*, we adopt that analysis here. Looking first at Section 78a.52a of the Unconventional Well Regulations, we find adequate legislative authority under Sections 5(b)(1) and 402(a) of The Clean Streams Law and Sections 3202, 3217, 3259, and 3274 of Act 13 to support the area of review survey portions of the challenged regulations, specifically 25 Pa. Code § 78a.52a(a), (b), (c)(1)-(2), (4)-(6), (d), and (e). Accordingly, we will grant the Agencies' application for partial summary relief with respect to the Coalition's challenge to these provisions under the first *Tire Jockey* standard.

On the other hand, we conclude that the Agencies have failed to identify any statutory authority to justify regulations that impose entry, inspection, and monitoring obligations with respect to wells on the lands of others and over which the stimulating well operator has no control, particularly in the absence of any actual pollution or threatened pollution on those lands attributable to the stimulating well operator's activities. As the Supreme Court recognized in *MSC II*, the authority given to the Department under The Clean Streams Law, which the Agencies cite in support of their current application for partial summary relief,

> to require entry onto others' land is not only discretionary, it is only triggered by actual pollution or a danger of pollution. The new regulatory mandate to enter onto others' land, visually monitor their wells, and cap their wells if necessary, is far broader. Indeed, the regulations dictate that all identified wells be visually monitored during stimulation activities, although it is not evident how

21

> this may be achieved without traversing the lands of others. The Agencies have not brought to our attention a legal basis on which [the Department] would be authorized to require access onto private land in the case of an inaccessible well which posed no apparent danger of pollution.

*MSC II*, 185 A.3d at 1000.[20] Moreover, with respect to the plugging requirement, this Court in *MSC I* identified a substantial legal question as to whether Section 78a.73(d) of the Unconventional Well Regulations is inconsistent with the well plugging requirements set forth in Section 3220 of Act 13, which places the onus on the owner or operator to plug its own wells, not the wells of others, and how this provision relates to the Department's authority to plug wells under Section 3271 of Act 13, 58 Pa. C.S. § 3271 (relating to well plugging funds). The Agencies fail to address that question in their application for summary relief and supporting brief.

For the above reasons, the Agencies have failed to establish a clear right to relief with respect to the Coalition's legal challenge to Sections 78a.52a(c)(3) and 78a.73(c) and (d) of the Unconventional Well Regulations, which *require* well operators to monitor all wells identified in the area of review survey, regardless of whether those wells are accessible to the well operator, and *require* well operators to plug any well within the survey area that becomes impacted by the well operator's stimulation activities, again regardless of whether the affected well is accessible to the well operator and whether the impact results in actual or threatened pollution of

---

[20] We reject the Agencies' reliance on *Harmer Coal*, as that case dealt specifically with the discharge of pollution, not mere entry by a mine operator on the property of another to monitor for possible pollution. *See MSC II*, 185 A.3d at 1000-01. Nor are the other opinions cited by the Agencies on point, as they either deal with the right of access to mineral rights on the property of another or the right of entry onto the property of another to abate a nuisance. The challenged area of review regulations address neither.

the waters of the Commonwealth. Accordingly, we will deny the Agencies' application for partial summary relief directed to these provisions under the first *Tire Jockey* standard.

### B. On-Site Processing (Count III)—Cross-Applications

Count III of the Petition is directed toward a single provision, Section 78a.58(f) of the Unconventional Well Regulations, 25 Pa. Code § 78a.58(f), relating to the processing of residual waste generated from well operations. It provides: "Processing residual waste generated by the development, drilling, stimulation, alteration, operation or plugging of oil or gas wells other than as provided for in subsections (a) and (b) shall comply with the [SWMA].[21]" (Citation omitted.)

In its Petition, the Coalition alleges that Section 78a.58(f) requires that certain on-site residual waste processing activities comply with the SWMA. (Petition ¶¶ 51, 52.) The Coalition notes that, as a result, on-site waste processing will be subjected to requirements not previously imposed on the industry with no grandfathering or period of transition. (*Id.* ¶¶ 53, 54.) In terms of the legality of this provision, the Coalition contends only that the regulation conflicts with Section 3273.1 of Act 13, 58 Pa. C.S. § 3273.1, which the Coalition maintains exempts well sites from the permitting and bond requirements under the SWMA. (*Id.* ¶ 55.)

The parties' respective briefing on this aspect of the cross-applications is less than pellucid. Indeed, while some disagreement between the parties appeared evident to the Court at prior stages of this litigation, it is somewhat difficult now to

---

[21] Act of July 7, 1980, P.L. 380, *as amended*, 35 P.S. §§ 6018.101-.1003, repealed to the extent inconsistent with the Low-Level Radioactive Disposal Act, Act of February 9, 1988, P.L. 31, 35 P.S. § 7130.101-.905.

discern any meaningful disagreement over the regulation's proper interpretation and application. Nonetheless, whether the Coalition can prevail on this count of the Petition comes down to a pure question of law, that being whether the challenged regulation is in conflict with Section 3273.1 of Act 13. A legislative rule in conflict with statute cannot stand. *Slippery Rock*, 983 A.2d at 1236.

> Section 3273.1(a) of Act 13, 58 Pa. C.S. § 3273.1(a), provides:
>
> The obligation to obtain a permit and post a bond under . . . the [SWMA], and to provide public notice under . . . The Administrative Code of 1929,[22] for any pit, impoundment, method or facility employed for the disposal, processing or storage of residual wastes generated by the drilling of an oil or gas well or from the production of wells which is located on the well site,[23] shall be considered to have been satisfied if the owner or operator of the well site meets the following conditions:
>
> > (1) the well is permitted under the requirements of [S]ection 3211 (relating to well permits) [of Act 13, 58 Pa. C.S. § 3211,] or registered under [S]ection 3213 (relating to well registration and identification) [of Act 13, 58 Pa. C.S. § 3213];
> >
> > (2) the owner or operator has satisfied the financial security requirements of [S]ection 3225 (relating to bonding) [of Act 13, 58 Pa. C.S. § 3225,] by obtaining a surety or collateral bond for the well and well site; and
> >
> > (3) the owner or operator maintains compliance with this chapter and applicable regulations of the [EQB].

Section 3273.1(c) of Act 13, 58 Pa. C.S. § 3273.1(c), is also germane: "This section does not diminish or otherwise affect duties or obligations of an owner or operator

---

[22] Act of April 9, 1929, P.L. 177, *as amended*, 71 P.S. §§ 51-732.

[23] "Well site" is defined as "areas occupied by all equipment or facilities necessary for or incidental to drilling, production or plugging a well." 58 Pa. C.S. § 3273.1(d).

24

under the [SWMA]. This section does not apply to waste classified as hazardous waste . . . ."

When interpreting a statute, this Court is guided by the Statutory Construction Act of 1972, 1 Pa. C.S. §§ 1501-1991, which provides that "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa. C.S. § 1921(a). "The clearest indication of legislative intent is generally the plain language of a statute." *Walker v. Eleby*, 842 A.2d 389, 400 (Pa. 2004). "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa. C.S. § 1921(b). Only "[w]hen the words of the statute are not explicit" may this Court resort to statutory construction. *Id.* § 1921(c).

Here, we find no ambiguity in the statutory language. Generally speaking, Section 3273.1(a) of Act 13 recognizes that residual waste[24] will be generated by oil and gas operations on a well site. Accordingly, under this section, an owner or operator with a permitted/registered and bonded well site under Act 13 is excused from having to acquire a separate permit, file a separate bond, and provide separate notice under the SWMA with respect to the on-site handling (*e.g.*, "disposal, processing or storage") of that residual waste. In other words, the process

---

[24] Section 103 of the SWMA, 35 P.S. § 6018.103 (definitions), defines the term "residual waste," in relevant part, as follows:

> Any garbage, refuse, other discarded material or other waste including solid, liquid, semisolid, or contained gaseous materials resulting from industrial, mining and agricultural operations and any sludge from an industrial, mining or agricultural water supply treatment facility, waste water treatment facility or air pollution control facility, provided that it is not hazardous.

Residual waste generated at a well site is considered "solid waste" under the SWMA, with the exception of drill cuttings that are disposed of at the well site at which they are generated. 35 P.S. § 6018.103 (definitions of "solid waste" and "drill cuttings").

25

under Act 13 satisfies the permit, bonding, and notice requirements under the SWMA. Such is the case so long as the well owner or operator maintains compliance with Act 13 and the EQB's regulations promulgated with respect thereto. Finally, Section 3273.1(c) of Act 13 makes clear that the well owner or operator—though relieved of the separate permit, bonding, and notice requirements—must still comply with the other obligations imposed on owners and operators under the SWMA.

The Coalition's concern seems to be that, notwithstanding the foregoing, Section 78a.58(f) of the Unconventional Well Regulations is worded so broadly that it requires separate permitting, bonding, and notice under the SWMA. This concern is the source of the Coalition's conflict claim. (Petition ¶ 55.) In their brief in opposition to the Coalition's application for summary relief, however, the Agencies dispute such a reading:

> [The Coalition] manufactures a "conflict" by reading into 25 Pa. Code § 78a.58(f) a requirement that all residual waste processing at the well site other than the processing of fluids under subsections (a) and (b) must be permitted, meet the bonding requirements, and provided [sic] public notice in accordance with the SWMA. However, 25 Pa. Code § 78a.58(f) creates no such requirement.

(Agencies' Br. in Supp. of Resp. to Pet'r's Appl. at 33-34.) Instead, the Agencies contend that Section 78a.58(f) is merely a restatement of Section 3273.1(c) of Act 13.

As noted above, declaratory relief is only available to resolve a real controversy. *Gulnac*, 587 A.2d at 701. Here, based on our reading of the parties' respective positions as to the proper interpretation of Section 78a.58(f) of the Unconventional Well Regulations, as well as our construction of Section 3273.1(a) of Act 13, we discern no conflict or controversy appropriate for pre-enforcement

26

review under the Declaratory Judgments Act. Indeed, both parties appear to adopt the same reading of Section 78a.58(f), which does not, in our view, conflict with our reading of Section 3273.1(a) of Act 13. Accordingly, we will deny the Coalition's application for summary relief on Count III of the Petition and grant the Agencies' cross-application.

## C. Well Development and Centralized Impoundments (Count IV)— Agencies' Application

### 1. Well Development Impoundments

The well development impoundment regulation, Section 78a.59b of the Unconventional Well Regulations, 25 Pa. Code § 78a.59b, establishes new registration, construction, security, and restoration standards for well development impoundments.[25] Any preexisting well development impoundments must come into

---

[25] Section 78a.59b of the Unconventional Well Regulations, 25 Pa. Code § 78a.59b provides:

(a) In addition to meeting the requirements of [25 Pa. Code] § 78a.59a (relating to impoundment embankments), any new well development impoundments must be in compliance with this section.

(b) A well operator using a well development impoundment prior to October 8, 2016, shall register the location of the well development impoundment by December 7, 2016, by providing the Department, through the Department's web site, with electronic notification of the GPS coordinates, township and county where the well development impoundment is located as well as certification as to whether the impoundment meets the requirements in subsections (d), (e) and (h). Any impoundments that do not comply with the requirements in subsections (d), (e) and (h) shall be upgraded to meet these requirements or restored in accordance with subsection (g) by October 10, 2017.

(c) A well operator shall register the location of a new well development impoundment prior to construction. Registration of the well development impoundment may be transferred to another operator. Registration transfers shall utilize forms provided by the Department and be submitted electronically to the Department through its web site.

(d) Well development impoundments shall be constructed with a synthetic impervious liner.

(e) Unless an individual is continuously present at a well development impoundment, a fence must completely surround the well development impoundment to prevent unauthorized acts of third parties and damage caused by wildlife.

(f) The bottom of the impoundment must be at least 20 inches above the seasonal high groundwater table. The applicant may maintain the required separation distance of 20 inches by passive artificial means such as an under-drain system throughout the lifetime of the impoundment. In no case shall the regional groundwater table be affected by the passive artificial system. The operator shall document the depth of the seasonal high groundwater table, the manner in which the depth of the seasonal high groundwater table was ascertained, the distance between the bottom of the impoundment and the seasonal high groundwater table, and the depth of the regional groundwater table if the separation between the impoundment bottom and seasonal high groundwater table is maintained by artificial means. A soil scientist or other similarly trained person using accepted and documented scientific methods shall make the determination. The determination must contain a statement certifying that the impoundment bottom is at least 20 inches above the seasonal high groundwater table according to observed field conditions. The name, qualifications and statement of the person making the determination and the basis of the determination shall be provided to the Department upon request.

(g) Well development impoundments shall be restored by the operator that the impoundment is registered to within 9 months of completion of hydraulic fracturing of the last well serviced by the impoundment. An impoundment is restored under this subsection by the operator removing excess water and the synthetic liner, returning the site to approximate original conditions, including preconstruction contours, and supporting the land uses that existed prior to oil and gas operations to the extent practicable. An extension of the restoration requirement may be approved under [25 Pa. Code] § 78a.65(c) (relating to site restoration). If requested by the landowner in writing, on forms provided by the Department, the requirement to return the site to approximate original contours may be waived by the Department if the liner is removed from the impoundment.

(h) Prior to storing mine influenced water in a well development impoundment, the operator shall develop a mine influenced water storage plan and submit it to the Department for approval.

compliance with the new standards or be restored to certain preconstruction conditions. In paragraph 64 of its Petition, the Coalition claims that the regulation is unlawful, illegal, void, and unenforceable because the Agencies lack authority under Act 13 to promulgate regulations applicable to freshwater impoundments[26] off well sites. Instead, the Coalition alleges that such impoundments are regulated under The Clean Streams Law and the Dam Safety and Encroachments Act (DSEA).[27] (Petition ¶ 64(a).) Further, the Coalition maintains that the obligations imposed on freshwater impoundments by the regulation violate Article III, Section 32 of the Pennsylvania Constitution, which generally prohibits enactment of a "local or

<hr>

(1) The mine influenced water storage plan shall be submitted on forms provided by the Department and include the following:

(i) A demonstration that the escape of the mine influenced water stored in the well development impoundment will not result in air, water or land pollution, or endanger persons or property.

(ii) A procedure and schedule to test the mine influenced water. This testing shall be conducted at the source prior to storage in the impoundment.

(iii) A records retention schedule for the mine influenced water test results.

(2) An operator with an approved mine influenced water storage plan shall maintain records of all mine influenced water testing prior to storage. These records shall be made available to the Department upon request.

(i) The Department may require the operator to test water sources proposed to be stored in a well development impoundment prior to storage.

[26] In this particular claim, the Coalition apparently uses the term "freshwater" to refer to a general type of impoundment, which it believes includes "well development" impoundments. As noted above, however, well development impoundments may or may not contain fresh water. *See* 25 Pa. Code § 78a.1 (definitions).

[27] Act of November 26, 1978, P.L. 1375, *as amended*, 32 P.S. §§ 693.1-.27.

29

special law in any case which has been or can be provided for by general law." (*Id.* ¶ 64(c).) The Coalition also challenges the regulation as unreasonable. (*Id.* ¶ 64(d).) The Agencies' application only seeks summary relief with respect to the Coalition's lack of authority challenge under *Tire Jockey* and its constitutional challenge.

As noted above, to prevail on its lack of authority challenge under *Tire Jockey*, the Coalition must establish the absence of granted authority from the General Assembly. In their application, the Agencies maintain that their authority to promulgate the well development impoundment regulation lies within three statutes—*i.e.*, The Clean Streams Law, Act 13, and the DSEA.[28] To prevail, then, on its *Tire Jockey* challenge, the Coalition must do more than merely establish that the Agencies lack the authority under any one of these statutes. Instead, the Coalition must establish that none of these statutes provide the necessary grant of authority to the Agencies to promulgate the well development impoundment regulation.

In Count IV of the Petition, however, the Coalition seeks a declaration of invalidity based only on its view that *Act 13*, in isolation, does not authorize the

---

[28] With respect to the DSEA specifically, Section 5(a) of the DSEA, 32 P.S. § 693.5(a), provides:

> The [EQB] shall have the power, and its duty shall be, to adopt such regulations and standards for the design, construction, operation, monitoring, maintenance, modification, repair and removal of dams and reservoirs, water obstructions and encroachments as are necessary and proper to carry out the purposes of this act.

The term "dam" is defined under the DSEA as follows:

> Any artificial barrier, together with its appurtenant works, constructed for the purpose of impounding or storing water or any other fluid or semifluid; or any refuse bank fill or structure for highway, railroad or other purposes which does or may impound water or any other fluid or semifluid.

Section 3 of the DSEA, 32 P.S. § 693.3 (definitions). The EQB's DSEA regulations are found in Title 25, Chapter 105 of the Pennsylvania Code (DSEA Regulations).

Department to regulate "freshwater impoundments off well sites, including well development impoundments." (Petition ¶ 64(a).) This request appears to be driven by the Coalition's perception that Act 13 is "the principal statute under which the Agencies promulgated Chapter 78a." (Coalition Br. in Opp'n at 37.) The Agencies address that particular challenge in their application for summary relief, citing several provisions of Act 13 as the source authority for the well development impoundment regulation. *See* 58 Pa. C.S. §§ 3202(1) (noting purpose of Act 13 is to "[p]ermit optimal development of oil and gas resources of [the] Commonwealth consistent with protection of the health, safety, environment and property of Pennsylvania citizens"); 3259(2)(ii) (making unlawful, *inter alia*, drilling for or production of oil and gas "in any manner as to . . . affect public health, safety, welfare or the environment"); 3274 (generally authorizing EQB to "promulgate regulations to implement this chapter").

The Coalition's perception of the source authority of the Unconventional Well Regulations, however, is not reality. The Agencies promulgated the Unconventional Well Regulations to regulate a particular method of natural gas extraction, not to implement a particular statute. *See* 25 Pa. Code § 78a.2 ("This chapter applies to unconventional wells and supersedes any regulations in Chapter 78 . . . applicable to unconventional wells."). In so doing, the Agencies identified several sources of statutory authority, including, *inter alia*, The Clean Streams Law and the DSEA. *Final Rulemaking, Environmental Protection Performance Standards at Oil and Gas Well Sites*, 46 Pa. B. 6431, 6432 (Oct. 8, 2016) (Final Rulemaking). As noted above, to prevail under the first *Tire Jockey* standard, the Coalition must show a complete absence of granted authority under all of the cited statutes.

31

The Coalition's concession that The Clean Streams Law and the DSEA provide this authority means that even if we were to find an absence of authority in Act 13, the Coalition is not entitled to a declaration of invalidity under the first *Tire Jockey* standard. *See also MSC II*, 185 A.3d at 1003 ("Absent any particularized contention tending to cast doubt upon the Agencies' position that [the] DSEA allows for such regulations, there is little basis in the present record to believe the Agencies lacked the authority to promulgate Section 78a.59b(b)." (citation omitted)). For this reason, we will grant the Agencies' application for summary relief with respect to the Coalition's claim that the Agencies lack the statutory authority to promulgate Section 78a.59b of the Unconventional Well Regulations.

We turn now to the Coalition's claim that the well development impoundment regulation is an unconstitutional special law under Article III, Section 32 of the Pennsylvania Constitution.[29] The Coalition mounts what is, in essence, an equal protection challenge to the regulation. *See Pa. Tpk. Comm'n v. Cmwlth.*, 899 A.2d 1085, 1094-95 (Pa. 2006); *DeFazio v. Civil Serv. Comm'n of Allegheny Cty.*, 756 A.2d 1103, 1105 (Pa. 2000). "The common constitutional principle at the heart of the special legislation proscription and the equal protection clause is that like persons in like circumstances should be treated similarly by the sovereign." *Tpk. Comm'n*, 899 A.2d at 1094. Nonetheless, the legislature, and by extension agencies granted authority to promulgate legislative rules, may regulate based on classifications, so long as (1) the challenged statute or regulation promotes a legitimate state interest, (2) the disparate treatment is reasonable and based on some difference that justifies the dissimilar treatment, and (3) there is a "fair and

---

[29] Article III, Section 32 of the Pennsylvania Constitution provides, in relevant part: "The General Assembly shall pass no local or special law in any case which has been or can be provided for by general law . . . ."

substantial relationship" between the requirements imposed and the overall objective of the underlying legislation. *Robinson Twp. v. Cmwlth.*, 147 A.3d 536, 581 (Pa. 2016) (*Robinson Twp. III*).

In their application, the Agencies contend that their regulation of well development impoundments meets this standard. They rely on excerpts from two documents to support their contention. The first is the Regulatory Analysis Form (RAF), which the Agencies submitted to the Independent Regulatory Review Commission (IRRC) for consideration with the proposed Unconventional Well Regulations. The second is the Final Rulemaking, published in the Pennsylvania Bulletin on October 8, 2016. Both, the Agencies argue, set forth characteristics of well development impoundments that justify unique treatment.

According to these documents, well development impoundments can contain millions of gallons of fluid transported to the impoundments from a variety of sources. The impoundments can hold both fresh water and other Department-approved fluids, including mine influenced water and treated water from sewage plants. In other words, the fluids contained in these impoundments are not indigenous to the watershed in which the impoundment is located. Moreover, the Agencies note that the impoundments are typically located in remote and rural areas of the Commonwealth, "where sensitive aquatic resources often reside." (Agencies' Br. in Supp. at 47-48.) In short, the Agencies contend that the size, quality, and characteristics of the stored fluid and the location of these impoundments warrant heightened regulatory standards to ensure that they do not fail.

In response, the Coalition notes that while the Agencies have attempted to identify a legitimate state interest based on general and summary characteristics

of well development impoundments in the unconventional well industry, the Agencies have failed to explain how those purported differences warrant dissimilar treatment from freshwater impoundments in other industries. The Coalition also claims that there is no record support for the Agencies' contention that (a) well development impoundments store water in a different watershed from the water's original source and (b) that, even if true, this is unique for impoundments in the unconventional well industry. The Coalition emphasizes that having safe impoundments is a goal across industries, which is why the DSEA Regulations require permits for impoundments that exceed a certain size. *See* 25 Pa. Code § 105.3(a)(2).

Upon review and consideration of the parties' arguments, we will deny the Agencies' application for summary relief on the constitutional question. Although the Agencies advance what appear to be largely uncontroverted facts about the characteristics of well development impoundments generally, we nonetheless agree with the Coalition that the Agencies fail to elucidate how those characteristics, when compared with impoundments in other industries, warrant special treatment in the Unconventional Well Regulations. Moreover, neither party has explained, with appropriate citation to legal authority, the extent to which so-called "freshwater" impoundments in other, unidentified industries are regulated. We cannot dispose of a special law constitutional challenge without comparing how one class of impoundment is treated when compared to another. Only by making this comparison can we determine whether the disparate treatment is rational under the appropriate legal test. Both parties fail to provide the Court with the necessary

34

factual and legal argument to make that determination as a matter of summary relief.[30]

## 2. *Centralized Impoundments*

The centralized impoundment regulation, Section 78a.59c of the Unconventional Well Regulations, 25 Pa. Code § 78a.59c,[31] requires a well operator

---

[30] As this matter moves forward, we remind the Coalition that the Agencies do not have the burden of showing that the challenged regulations are constitutional. Rather, the Coalition bears the burden of proof and ultimate burden of persuasion on its constitutional challenges. *See Pennsylvanians Against Gambling Expansion Fund, Inc. v. Cmwlth.*, 877 A.2d 383, 393 (Pa. 2005) (noting legislative enactments enjoy presumption of constitutionality and person that challenges constitutionality bears "very heavy burden of persuasion"); *see also Tire Jockey*, 915 A.2d at 1186 (holding that valid legislative rule is "binding upon courts as a statute" and constitutes legislative enactment).

[31] Section 78a.59c of the Unconventional Well Regulations provides:

(a) An operator using a centralized impoundment as of October 8, 2016, shall close the centralized impoundment in accordance with this section or obtain a permit in accordance with [Title 25,] Subpart D, Article IX [of the Pennsylvania Code] (relating to residual waste management). The closure plan shall be submitted electronically to the Department through its web site for review and approval no later than April 8, 2017. The operator shall properly close the centralized impoundment in accordance with the approved plan or obtain a permit in accordance with [Title 25,] Subpart D, Article IX [of the Pennsylvania Code] no later than October 8, 2019.

(b) The closure plan must provide for the following:

(1) Removal of any impermeable membrane, concrete and earthen liner so that water movement to subsoils is achieved.

(2) Restoration of the site to approximate original conditions, including preconstruction contours, and backfilling the impoundment to above finished grade to allow for settlement of fill and so the impoundment will no longer impound water.

(3) A plan for the removal of equipment, structures, wastes and related material from the facility.

(4) An estimate of when final closure will occur, including an explanation of the basis for the estimate.

using a centralized impoundment either to close the centralized impoundment pursuant to standards set forth in the regulation or to obtain a permit under the Agencies' Residual Waste Management Regulations.[32] In paragraph 64 of its Petition, the Coalition claims that the centralized impoundment regulation is unlawful, illegal, void, and unenforceable because the SWMA does not require a permit for centralized storage impoundments. (Petition ¶ 64(b).) The Coalition also

---

(5) A description of the steps necessary for closure of the facility.

(6) A narrative description, including a schedule of measures that are proposed to be carried out in preparation for closure and after closure at the facility, including measures relating to the following:

(i) Water quality monitoring including, but not limited to, analyses of samples from the monitoring wells that were installed at the time of the construction of the centralized impoundment.

(ii) A soil sampling plan that explains how the operator will analyze the soil beneath the impoundment's liners. Analysis shall be based on a grid pattern or other method approved by the Department. Any spills or leaks detected shall be reported and remediated in accordance with [25 Pa. Code] § 78a.66 (relating to reporting and remediating spills and releases) prior to impoundment closure.

(iii) Compliance with Chapter 102 (relating to erosion and sediment control) including erosion and sediment control and PCSM.

(iv) Access control, including maintenance of access control.

(v) The name, address and telephone number at which the operator may be reached.

We will refer to Title 25, Chapter 102 of the Pennsylvania Code as the "E&S/PCSM Regulations." "E&S" appears to stand for "erosion and sedimentation." *See* 25 Pa. Code § 102.1 (definitions). Pursuant to both the Unconventional Well Regulations and the E&S/PCSM Regulations, "PCSM" stands for post-construction stormwater management. 25 Pa. Code § 78a.1 (definitions); 25 Pa. Code § 102.1 (definitions).

[32] Title 25, Part I, subpart D, art. IX of the Pennsylvania Code (25 Pa. Code §§ 287.1-299.232).

claims that the centralized impoundment regulation is an unconstitutional special law under Article II, Section 32 of the Pennsylvania Constitution. (*Id.* ¶ 64(c).) The Coalition also challenges the regulation as unreasonable. (*Id.* ¶ 64(d).) The Agencies' application only seeks summary relief with respect to the Coalition's lack of authority challenge under *Tire Jockey*.

The Agencies acknowledge that prior to the passage of the Unconventional Well Regulations, the Agencies regulated the construction and maintenance of centralized impoundments in the unconventional well industry through a document titled "Design and Construction Standards for Centralized Impoundment Dams," designated DEP # 8000-PM-OOGM0084 (Prior Standards). (Agencies' Br. in Supp. at 11 & Ex. E.) The Prior Standards generally required the operators of centralized impoundments to design, construct, and maintain them "to be structurally sound and reasonably protected from unauthorized acts of third parties." (*Id.* at Ex. E.) In addition, the Prior Standards required centralized impoundments to comply with the Agencies' general oil and gas regulations (25 Pa. Code Ch. 78) as well as the DSEA Regulations. The Prior Standards also addressed the following: (1) areas where centralized impoundments are prohibited; (2) construction standards; (3) liner system requirements; (4) water quality monitoring; and (5) professional engineer certification. The Prior Standards did not mention compliance with the SWMA or permitting under the Residual Waste Management Regulations.

The Agencies further acknowledge that the new centralized impoundment regulation imposes more rigorous requirements than the Prior Standards. They nonetheless claim that promulgation of the new centralized impoundment regulation falls within their granted authority under The Clean

37

Streams Law, the SWMA, and Act 13. With respect to The Clean Streams Law, the Agencies cite specifically Section 402(a) of The Clean Streams Law, which provides:

> Whenever the [D]epartment finds that *any activity*, not otherwise requiring a permit under this act, *including but not limited to the impounding*, handling, storage, transportation, processing or disposing *of materials or substances*, creates a danger of pollution of the waters of the Commonwealth or that regulation of the activity is necessary to avoid such pollution, *the [D]epartment may, by rule or regulation, require that such activity be conducted only pursuant to a permit issued by the [D]epartment or may otherwise establish the conditions under which such activity shall be conducted*, or the [D]epartment may issue an order to a person or municipality regulating a particular activity. Rules and regulations adopted by the [D]epartment pursuant to this section shall give the persons or municipalities affected a reasonable period of time to apply for and obtain any permits required by such rules and regulations.

(Emphasis added.) As further support, the Agencies cite generally their authority to promulgate regulations "as are necessary to implement the provisions of" The Clean Streams Law as well as the declaration of policy underlying the law. *Id.* §§ 691.4-.5.[33]

The Agencies further contend that requiring centralized impoundments to comply with the Residual Waste Management Regulations is consistent with the goal of the SWMA to address "improper and inadequate solid waste practices [that] create public health hazards, environmental pollution, and economic loss, and cause irreparable harm to the public health, safety and welfare." Section 102 of the

---

[33] Section 4 of The Clean Streams Law, 35 P.S. § 691.4, was added by the Act of August 23, 1965, P.L. 372, and Section 5 of The Clean Streams Law, 35 P.S. § 691.5, was added by the Act of July 31, 1970, P.L. 653.

38

SWMA, 35 P.S. § 6018.102. Section 105(a) of the SWMA, 35 P.S. § 6018.105(a), authorizes the EQB to promulgate regulations to "accomplish the purposes and to carry out the provisions of the" SWMA. Because requiring centralized impoundments to comply with the Residual Waste Management Regulations protects the environment and the public, the centralized impoundment regulation is consistent with the EQB's grant of authority under the SWMA. Moreover, the Agencies contend that the SWMA regulates, *inter alia*, the storage of solid waste and that a centralized impoundment, though not mentioned specifically in the law, is simply one of many methods of storing residual waste.

Turning to Act 13, the Agencies note that one of the stated purposes of the law was to "[p]ermit optimal development of oil and gas resources . . . consistent with protection of the health, safety, environment and property of Pennsylvania citizens." 58 Pa. C.S. § 3202. The Agencies argue that allowing the continued use of centralized impoundments but under heightened standards strikes the balance between optimal development and safety. Accordingly, the Agencies maintain that the centralized impoundment regulation falls within the general grant of authority to promulgate Act 13 regulations: "The [EQB] shall promulgate regulations to implement this chapter." *Id.* § 3274.

Focusing only on the Coalition's arguments in opposition addressed to the first *Tire Jockey* standard,[34] the Coalition contends that the centralized impoundment regulation reflects not a change in law but a change in the Agencies' longstanding interpretation of the law, specifically the SWMA and the Agencies' authority thereunder. The Coalition first directs the Court to the definition of

---

[34] Much of the Coalition's argument in its brief in opposition with respect to the centralized impoundment regulation focuses on the third *Tire Jockey* standard—reasonableness, which is not encompassed within the relief the parties seek in their cross-applications for summary relief.

39

"centralized impoundment" in the Unconventional Well Regulations, where the term is defined by specific reference to a facility previously permitted under the DSEA, as reflected in the Prior Standards.[35] In essence, the Coalition maintains that it had long been the Agencies' position that centralized impoundments were subject to permitting only under the DSEA and not the SWMA or other legislation.

The Coalition argues that Act 13 does not provide a grant of authority to the Agencies to regulate centralized impoundments. Specifically, it notes that the Act makes no reference to centralized impoundments. The Coalition argues that a legislative statement of purpose alone (58 Pa. C.S. § 3202) should not be read as a grant of power to regulate centralized impoundments. Similarly, it contends that broadly written prohibitions against harming the environment (*id.* § 3259) do not authorize regulation of centralized impoundments. Finally, in the absence of any mention of impoundments in Act 13's substantive provisions, the Coalition contends that the general authority to promulgate regulations to implement that law (*id.* § 3274) cannot serve as authority to regulate that which the law does not address.

As for The Clean Streams Law, the Coalition acknowledges that Section 402 of the Clean Streams Law empowers the Agencies to adopt regulations to address particular activities that create a danger of pollution to the waters of the Commonwealth. The Coalition argues that there is, however, no "specific and express" authority to regulate impoundments in that section. To the extent the Agencies rely on some sort of implied authority to regulate centralized

---

[35] The Unconventional Well Regulations define "centralized impoundment" as "[a] facility authorized by a Permit for a Centralized Impoundment Dam for Oil and Gas Operations (DEP # 8000-PM-OOGM0084)." 25 Pa. Code § 78a.1 (definitions). Included in the Coalition's materials opposing the Agencies' application is a blank "Application for a Dam Permit for a Centralized Impoundment Dam for Oil and Gas Wells," referencing DEP # 8000-PM-OOGM0084. (Mosites Suppl. Aff. Ex. 15.)

impoundments, the Coalition argues that there is no record evidence to support the Agencies' concern that heightened standards are necessary because existing, permitted centralized impoundments have the potential to leak and cause pollution. The Coalition notes that the Agencies provide but one example of a centralized impoundment failure in support of their claim that these impoundments have a history of failure. Further, the Coalition highlights what it contends were "stringent" regulations under which the existing centralized impoundments were constructed prior to the Unconventional Well Regulations.

Finally, the Coalition argues that the SWMA provides permitting only for processing and disposal of residual waste. Specifically, Section 301 of the SWMA, 35 P.S. § 6018.301, provides:

> No person or municipality shall store, transport, process, or dispose of residual waste within this Commonwealth unless such storage, or transportation, is consistent with or such processing or disposal is authorized by the rules and regulations of the [D]epartment and *no person or municipality shall own or operate a residual waste processing or disposal facility unless such person or municipality has first obtained a permit for such facility from the [D]epartment.*

(Emphasis added.) Centralized impoundments, the Coalition contends, are storage facilities. Accordingly, while the Agencies could develop standards relating to the storage of residual waste under the SWMA, the Coalition contends that the authority to require a permit does not extend to storage facilities.

The parties agree, and the Unconventional Well Regulations provide, that centralized impoundments are existing facilities that possess a Permit for a Centralized Dam for Oil and Gas Operations (DEP # 8000-PM-OOGM0084). 25 Pa. Code § 78a.1. The Prior Standards provided that centralized impoundments are "utilized by natural gas production operations *to store* wastewaters associated with

41

natural gas operations (*e.g.*, flowback, mine influenced water, wastewater treatment plant effluent)." (Agencies' Br. in Supp., Ex. E at 1 (emphasis added).) These centralized impoundments, then, are previously permitted residual waste *storage* facilities. Based on our reading of the Coalition's claim in the Petition and the parties' arguments with respect to the first *Tire Jockey* prong, the central question appears to be whether the Agencies have the statutory grant of authority to require operators either to close or re-permit their centralized impoundments under the Residual Waste Management Regulations.

We acknowledge the Agencies' claim that the Residual Waste Management Regulations, like the Unconventional Well Regulations, were promulgated under authority conferred by a string cite of laws, including, *inter alia*, the SWMA and The Clean Streams Law. The regulations span several chapters. The general permit provisions largely track the SWMA permitting requirements. As noted above, while the SWMA generally regulates the storage, transportation, processing, and disposal of residual waste, the law imposes a permitting requirement on only residual waste processing or disposal facilities. It does not require a permit to *store* residual waste.[36] Consistent with the SWMA, the word "permit" in the Residual Waste Management Regulations refers to "[a] permit issued by the Department to operate a residual waste disposal or processing facility or to beneficially use residual waste." 25 Pa. Code § 287.1 (definitions). Accordingly, like the SWMA, the general requirement for a permit under the Residual Waste

---

[36] The SWMA defines "storage" as follows:

The containment of any waste on a temporary basis in such a manner as not to constitute disposal of such waste. It shall be presumed that the containment of any waste in excess of one year constitutes disposal. This presumption can be overcome by clear and convincing evidence to the contrary.

35 P.S. § 6018.103 (definitions).

Management Regulations is limited to those that operate a residual waste disposal or processing facility. *Id.* § 287.101(a).

The storage of residual waste, by surface impoundment or otherwise, is addressed separately in Chapter 299 of the Residual Waste Management Regulations. With respect to impoundments specifically,[37] those that seek to store residual waste in a surface impoundment must hold a valid permit under The Clean Streams Law, not the SWMA, and must comply with the DSEA Regulations. *Id.* § 299.142. A regulation that requires operators of surface impoundments that store residual waste to obtain a permit under The Clean Streams Law falls within the grant of authority from the General Assembly to the Department under Section 402(a) of The Clean Streams Law, which provides clear and express authority to the Department to impose permitting and related requirements on activities that, in the Department's assessment, create a "danger of pollution of the waters of the Commonwealth," or for which "regulation of the activity is necessary to avoid such pollution."[38] Section 78a.58c of the Unconventional Well Regulations appears to fall within this grant of authority.

---

[37] "Impoundment" is defined as follows:

A facility or part of a facility which is a natural topographic depression, manmade excavation, or diked area formed primarily of earthen materials although it may be lined with synthetic materials, and which is designed to hold an accumulation of liquid wastes or wastes containing free liquids. The term includes holding, storage, settling and aeration pits, ponds and lagoons. The term does not include injection wells.

25 Pa. Code § 287.1.

[38] *See EQT Prod. Co. v. Dep't of Envtl. Prot.*, 193 A.3d 1137 (Pa. Cmwlth. 2018) (en banc) (*EQT III*) (upholding civil penalty under The Clean Streams Law for leaking subsurface impoundment).

For this reason, we will grant the Agencies' application for summary relief with respect to the Coalition's claim that the Agencies lack the statutory authority to promulgate Section 78a.59c of the Unconventional Well Regulations. While the Agencies may lack statutory authority to require operators of centralized impoundments to obtain a permit for storage of residual waste under the SWMA, the Agencies are authorized to require permitting for storage under The Clean Streams Law and Chapter 299 of the Residual Waste Management Regulations.

### D.    Site Restoration (Count V)—Cross-Applications

The site restoration regulation, Section 78a.65 of the Unconventional Well Regulations, 25 Pa. Code § 78a.65, imposes standards and requirements relating to the restoration of well sites.[39] In paragraph 71 of its Petition, the Coalition

---

[39] Section 78a.65 of the Unconventional Well Regulations provides:

(a)    *Restoration.* The owner or operator shall restore land surface areas disturbed to construct the well site as follows:

(1) *Post-drilling.* Within 9 months after completion of drilling a well, the owner or operator shall undertake post-drilling restoration of the well site in accordance with a restoration plan developed in accordance with subsection (b) and remove all drilling supplies, equipment, primary containment and secondary containment not necessary for production or needed to safely operate the well.

(i) When multiple wells are drilled or permitted to be drilled on a single well site, post-drilling restoration is required within 9 months after completion of drilling all permitted wells on the well site or 9 months after the expiration of all existing well permits on the well site, whichever is later.

(ii) A drill hole or bore hole used to facilitate the drilling of a well shall be filled with cement, soil, uncontaminated drill cuttings or other earthen material before moving the drilling equipment from the well site.

(iii) Drilling supplies and equipment not needed for production may only be stored on the well site if express written consent of the surface landowner is obtained and the supplies or

44

equipment are maintained in accordance with [25 Pa. Code] § 78a.64a (relating to secondary containment).

    (iv) The areas necessary to safely operate the well include the following:

        (A) Areas used for service vehicle and rig access.

        (B) Areas used for storage tanks and secondary containment.

        (C) Areas used for wellheads and appurtenant oil and gas processing facilities.

        (D) Areas used for any necessary safety buffer limited to the area surrounding equipment that is physically cordoned off to protect the facilities.

        (E) Areas used to store any supplies or equipment consented to by the surface landowner.

        (F) Areas used for operation and maintenance of long-term PCSM best management practices.

    (2) *Post-plugging.* Within 9 months after plugging the final well on the well site, the owner or operator shall remove all production or storage facilities, supplies and equipment and restore the well site to approximate original conditions and restore stormwater runoff rate, volume and quality to preconstruction condition in accordance with [25 Pa. Code] § 102.8 (relating to PCSM requirements).

    (3) *Wells not drilled.* If a well site is constructed and the well is not drilled, the well site shall be restored within 9 months after the expiration of the well permit unless the Department approves an extension for reasons of adverse weather or lack of essential fuel, equipment or labor.

    (b) *Restoration plan.* An operator of a well site shall develop and implement a restoration plan. The restoration plan must address:

    (1) The restoration of areas not needed to safely operate the well to approximate original conditions.

    (2) The proposed site configuration after post-drilling restoration including the areas of the well site being restored.

    (3) The minimization of impervious areas. Impervious areas include, but are not limited to, areas where soil has been compacted, areas

where soil has been treated with amendments to firm or harden the soil, and areas underlain with an impermeable liner.

(4)  The removal of all drilling supplies and equipment not needed for production, including primary and secondary containment.

(5)  The manner in which the restoration of the disturbed areas will achieve meadow in good condition or better or otherwise incorporate [antidegradation best available combination of technologies (ABACT)] or nondischarge alternative PCSM best management practices (BMP).

(6)  PCSM BMPs remaining in place and proof of compliance with [25 Pa. Code] § 102.8(l) and (m), or a licensed professional certification of complete site restoration to approximate original contours and return to preconstruction stormwater runoff rate, volume and quality in accordance with [25 Pa. Code] § 102.8(g). The owner or operator shall remain responsible for compliance with the terms of the restoration plan including long-term operation and maintenance of all PCSM BMPs on the project site and is responsible for any violations occurring on the project site, prior to written approval of the final restoration report.

(7)  The permanent stabilization of the restored areas by either of the following:

(i)  In accordance with [25 Pa. Code] § 102.22 (relating to site stabilization).

(ii)  Through implementation of PCSM BMPs as required under [25 Pa. Code] § 102.8, including [25 Pa. Code] § 102.8(a)-(m).

(8)  An operator of a well site who [sic] is required to obtain a permit under [25 Pa. Code] § 102.5(c) (relating to permit requirements) may develop a written restoration plan containing drawings and a narrative that address the requirements of paragraphs (1)-(7) to demonstrate compliance with [25 Pa. Code] § 102.8(n).

(c)  *Extension of drilling or production period.*  The restoration period in this subsection may be extended through approval by the Department for an additional period of time, not to exceed 2 years.

(1)  A request to extend the restoration period shall be submitted electronically on forms provided by the Department through the Department's web site not more than 6 months after the completion of drilling.

(2)  The request must specify the reasons for the request to extend the restoration period not to exceed 24 months.  The request must include a justification for the length of extension and demonstrate that either:

(i)  The extension will result in less earth disturbance, increased water reuse or more efficient development of the resources.

(ii)  Restoration cannot be achieved due to adverse weather conditions or a lack of essential fuel, equipment or labor.

(3)  A demonstration that the extension will result in less earth disturbance, increased water reuse or more efficient development of the resources must include the following:

(i)  A demonstration that the site is stabilized and the BMPs utilized on the well site will address PCSM.

(ii)  A demonstration that the portions of the well site not occupied by production facilities or equipment will be returned to approximate original conditions.

(d)  *Areas not restored.*  Disturbed areas associated with well sites that are not included in a restoration plan, and other remaining impervious surfaces, must comply with all requirements in [Title 25,] Chapter 102 [of the Pennsylvania Code] (relating to erosion and sediment control).  The PCSM plan provisions in [25 Pa. Code] § 102.8(n) apply only to the portions of the restoration plan that provide for restoration of disturbed areas to meadow in good condition or better or otherwise incorporate ABACT or nondischarge PCSM BMPs.

(e)  *Post-drilling restoration reports.*  Within 60 calendar days after post-drilling restoration under subsection (a)(1), the operator shall submit a restoration report to the Department. The well operator shall forward a copy of all restoration reports to the surface landowner. The report shall be made electronically on forms provided by the Department through the Department's web site and must identify the following:

(1)  The date of land application of the tophole water.

(2)  The results of pH and specific conductance tests and an estimated volume of discharge.

(3)  The method used for disposal or reuse of the free liquid fraction of the waste, and the name of the hauler and disposal facility, if any.

(4)  The location, including GPS coordinates, of the pit in relation to the well, the depth of the pit, the type and thickness of the material used

47

challenges the regulation under the first *Tire Jockey* standard, claiming that the Agencies have exceeded their authority by imposing requirements beyond those set forth in Act 13. The Coalition lodges two challenges under the second *Tire Jockey* standard. First, the Coalition claims that the final regulation violates what is commonly referred to as the Commonwealth Documents Law by enlarging the original purpose of the proposed regulation published for public comment.

for the pit subbase, the type and thickness of the pit liner, the type and nature of the waste, the type of any approved solidifier, a description of the pit closure procedures used and the pit dimensions.

(5) The location of the area used for land application of the waste, and the results of a chemical analysis of the waste soil mixture if requested by the Department.

(6) The types and volumes of waste produced and the name and address of the waste disposal facility and waste hauler used to dispose of the waste.

(7) The name, qualifications and basis for determination that the bottom of a pit used for encapsulation is at least 20 inches above the seasonal high groundwater table.

(f) *Post-plugging restoration reports.* Within 60 calendar days after post-plugging restoration under subsection (a)(2), the operator shall submit a restoration report to the Department. The well operator shall forward a copy of all restoration reports to the surface landowner. The report shall be made electronically on forms provided by the Department through the Department's web site and must include the following:

(1) A description of the types and volumes of waste produced, and the name and address of the waste disposal facility and waste hauler used to dispose of the waste.

(2) Confirmation that earth disturbance activities, site restoration including an installation of any PCSM BMPs and permanent stabilization in accordance with [25 Pa. Code] § 102.22 have been completed.

(g) *Written consent.* Written consent of the landowner on forms provided by the Department satisfies the restoration requirements of this section provided the operator develops and implements a site restoration plan that complies with subsections (a) and (b)(2)-(7) and all PCSM requirements in [Title 25,] Chapter 102 [of the Pennsylvania Code].

(Petition ¶ 71(a).) Second, the Coalition claims that the Agencies failed to comply with the Regulatory Review Act, in that they provided no estimate for the cost of compliance in the RAF. (*Id.* ¶ 71(e).) In addition, the Coalition alleges that the regulation is improper because it conflicts with the Department's E&S/PCSM Regulations, specifically 25 Pa. Code § 102.8(n). (*Id.* ¶ 71(b).) The Coalition also claims that the regulation is void for vagueness. (*Id.* ¶ 71(a).) Finally, the Coalition claims that the regulation is unreasonable under the third *Tire Jockey* standard. (*Id.* ¶ 71(d).)

The Agencies seek summary relief with respect to the Coalition's challenges under the first (lack of authority) and second (proper procedures) *Tire Jockey* standards. The Coalition seeks summary relief with respect to its first *Tire Jockey* claim, focusing on subsections (a), (b), and (d) of the site restoration regulation. The Coalition also seeks summary relief with respect to its claim that the EQB failed to comply with the Commonwealth Documents Law in promulgating subsection (b) of the challenged regulation. The Coalition further seeks summary relief with respect to its vagueness challenge, focusing on subsection (b) of the challenged regulation. The Coalition further seeks summary relief with respect to the entirety of Section 78a.65 of the Unconventional Well Regulations, claiming that the entire section should be stricken for failure of the Agencies to comply with the Regulatory Review Act. Finally, the Coalition seeks summary relief with respect to its claim that the entirety of the regulation is unreasonable under the third *Tire Jockey* standard.

*1. Authority—Subsections (a) and (b)*

Section 78a.65(a) of the Unconventional Well Regulations establishes three distinct site restoration requirements for land surface areas disturbed during well site construction based on the status of the well site: (1) post-drilling;

49

(2) post-plugging; and (3) sites constructed but not drilled. 25 Pa. Code § 78a.65(a). Section 78a.65(b) of the Unconventional Well Regulations generally requires all well site operators to develop and implement a site restoration plan. *Id.* § 78a.65(b).

More specifically, within 9 months of completing drilling operations, the site restoration regulation requires operators to "remove all drilling supplies, equipment, primary containment and secondary containment not necessary for production *or needed to safely operate the well.*" *Id.* § 78a.65(a)(1) (emphasis added). The regulation further provides:

> (iv) The areas necessary to safely operate the well *include* the following:
>
> (A) Areas used for service vehicle and rig access.
>
> (B) Areas used for storage tanks and secondary containment.
>
> (C) Areas used for wellheads and appurtenant oil and gas processing facilities.
>
> (D) Areas used for any necessary safety buffer limited to the area surrounding equipment that is physically cordoned off to protect the facilities.
>
> (E) Areas used to store any supplies or equipment consented to by the surface landowner.
>
> (F) Areas used for operation and maintenance of long-term PCSM best management practices.

*Id.* § 78a.65(a)(1)(iv) (emphasis added). With respect to the site restoration plan requirements, the Coalition focuses its attention on the requirement that the plan address "[t]he restoration of areas not needed to safely operate the well to *approximate original conditions*." *Id.* § 78a.65(b)(1) (emphasis added).

In support of its application for summary relief, the Coalition contends that Section 3216 of Act 13, 58 Pa. C.S. § 3216, which addresses well site restoration, requires removal of supplies and equipment not "needed for production."

50

It does not, however, impose any obligation to reduce the footprint of a well site based on safety. The Coalition does not appear to challenge Section 78a.65(a)(1) of the Unconventional Well Regulations, which permits operators to retain equipment and supplies on *both* (1) areas of the well site which are necessary for production and (2) areas of the well site which are needed to safely operate the well. The Coalition instead targets the Agencies' authority to promulgate Section 78a.65(a)(1)(iv), creating a list of areas of a well site that are necessary to operate the well safely, which, in the Coalition's view, implies that operators must restore areas of a well site that are not listed. The Coalition maintains that operators, and not the Agencies, are better situated to define the areas of a well site that serve operational safety needs. Moreover, with respect to restoration of active well sites, the Coalition maintains that neither Act 13 nor The Clean Streams Law requires post-drilling restoration of active well sites to approximate original conditions, or "AOC." The Coalition further contends that imposing such a requirement "is likely to result in greater environmental impact than allowing the pad to remain at grade and be revegetated." (Coalition Br. in Supp. at 33.)

In response, the Agencies point to Sections 3216(c) and (d) of Act 13, 58 Pa. C.S. § 3216(c)-(d), in which the General Assembly provided for well restoration post-drilling and post-plugging:

> **(c)    Pits, drilling supplies and equipment.**—
> Within nine months after completion of drilling of a well, the owner or operator shall restore the well site, remove or fill all pits used to contain produced fluids or industrial wastes and remove all drilling supplies and equipment not needed for production. Drilling supplies and equipment not needed for production may be stored on the well site if express written consent of the surface landowner is obtained.

51

**(d) Items related to production or storage.**—
Within nine months after plugging a well, the owner or operator shall remove all production or storage facilities, supplies and equipment and restore the well site.

The Agencies argue that these provisions clearly evidence the General Assembly's intent that the size of the well site would shrink post-drilling, followed by complete site restoration post-plugging.

As for authority to promulgate regulations to implement this two-step process, the Agencies cite Section 3274 of Act 13 (generally authorizing EQB to "promulgate regulations to implement this chapter"), as well as Section 3216(e) of Act 13, 58 Pa. C.S. § 3216(e), which provides that "[r]estoration activities required by this chapter *or in regulations promulgated under this chapter* shall also comply with all applicable provisions of The Clean Streams Law." (Emphasis added.) The Agencies contend that Section 78a.65(a) and (b) of the Unconventional Well Regulations provides guidance on the two-step restoration process envisioned in Section 3216 of Act 13, as well as the interplay with stormwater management under The Clean Streams Law. The Agencies do not address directly the Coalition's claim that the regulation limits the definition of areas "necessary to safely operate the well" in a manner inconsistent with the statutory focus on areas "needed for production."

With respect to the portion of the restoration regulation that requires post-drilling restoration to the AOC standard, the Agencies contend that the provision is consistent with "the purpose" of Section 3216 of Act 13—*i.e.*, that "[e]ach oil or gas well owner or operator shall restore the land surface within the areas disturbed in siting, drilling, completing and producing the well." 58 Pa. C.S. § 3216(a). The Agencies acknowledge that Section 3216(c) of Act 13 generally requires operators to complete post-drilling site restoration within 9 months after completing drilling activities, without referencing restoration to AOC. The

52

Agencies further acknowledge that under Section 3216(g)(2)(ii) of Act 13, 58 Pa. C.S. § 3216(g)(2)(ii), the restoration period may be extended by an additional 2 years where the well operator demonstrates, *inter alia*, that it will "return[] the portions of the site not occupied by production facilities or equipment to *approximate original contours* and mak[e] them capable of supporting the uses that existed prior to drilling the well." (Emphasis added.) The Agencies contend, however, that it is "reasonable and consistent with the statute" to require restoration to AOC regardless of whether an extension is granted. (Agencies' Br. in Supp. at 62.)

We have no difficulty concluding that the Agencies possess the statutory authority to promulgate regulations to implement the site restoration requirements of Section 3216 of Act 13. That authority exists generally under Section 3274 of Act 13, and is expressly recognized in Section 3216(e) of Act 13. We also agree with the Agencies that Section 3216, as adopted by the General Assembly, reflects a two-step restoration of the disturbed areas associated with a well site—(1) post-drilling, and (2) post-plugging. The question that remains, however, is whether the site restoration regulation is consistent with the site restoration mandates of Section 3216 of Act 13. *See Slippery Rock*, 983 A.2d at 1241.

Turning first to the statute, Section 3216(c) of Act 13, relating to restoration post-drilling, requires operators, *inter alia*, to "remove all drilling supplies and equipment *not needed for production*." (Emphasis added.) Stated otherwise, Section 3216(c) of Act 13 allows well operators to maintain on the well site post-drilling only supplies and equipment needed for production (for obvious reasons). While this text does not reference safety expressly, it is not difficult to discern an implicit expectation by the General Assembly that well operators engage

53

in production activities in a safe manner. The General Assembly cannot have intended that well operators retain on the well site only equipment and supplies needed for *reckless* production. Accordingly, it is fair to read the phrase "supplies and equipment needed for production" in the statute as encompassing any supplies and equipment necessary for *safe* production.

Section 78a.65(a)(1) of the Unconventional Well Regulations similarly requires the post-drilling removal of "all drilling supplies, equipment, primary containment and secondary containment not necessary for production *or needed to safely operate the well*." (Emphasis added.) In this regard, the regulation simply clarifies that, post-drilling, areas necessary for safe operation may be retained on the well site, which is consistent with the statute's allowance for retaining areas necessary for production, as we have explained above. This brings us to the Coalition's concern about the list of six areas on a well site designated in the regulation as areas "necessary to safely operate the well." 25 Pa. Code § 78a.65(a)(1)(iv). As noted above, the Coalition contends that this definition of areas "necessary to safely operate the well" exceeds statutory authority because it prevents well operators from retaining, as part of the well site, areas that are not listed in Section 78a.65(a)(1)(iv), but which, in the well operator's judgment, are necessary for safe production. In short, the Coalition posits that the list is fixed and exhaustive. We disagree.

When a legislative provision introduces a list with the word "include," as does Section 78a.65(a)(1)(iv) of the Unconventional Well Regulations, we interpret the list as non-exhaustive:

> [I]t is widely accepted that general expressions such as "including," or "including but not limited to," that precede a specific list of included items are to be considered as words of enlargement and not limitation. Indeed, such a

54

list of specific items is not meant to be exclusive of all items other than those specifically named . . . . [T]he presence of such a term as "including" in a definition exhibits a legislative intent that the list that follows *is not an exhaustive list* of items that fall within the definition.

*Dep't of Envtl. Prot. v. Cumberland Coal Res., LP*, 102 A.3d 962, 976 (Pa. 2014) (emphasis added). This expansive interpretation does not rob the definition of reasonable limits: "[A]ny additional matters purportedly falling within the definition, but that are not express, must be similar to those listed by the legislature and of the same general class or nature." *Id*. We apply principles of statutory construction to regulations as well as statutes. *Bayada Nurses, Inc. v. Dep't of Labor & Indus.*, 958 A.2d 1050, 1055 (Pa. Cmwlth. 2008), *aff'd*, 8 A.3d 866 (Pa. 2010). Accordingly, we do not accept the Coalition's implicit assertion that Section 78a.65(a)(1)(iv) presents an exhaustive list of areas necessary for safe operation, thereby requiring the post-drilling restoration of all areas not listed. That section of the regulation represents a recognition by the EQB that the enumerated areas need not be restored post-drilling, while allowing that other, non-enumerated areas may also remain post-drilling because they, too, may be necessary for safe production.[40]

Because we reject the Coalition's interpretation of Section 78a.65(a)(1)(iv) of the Unconventional Well Regulations as exhaustive and thus restrictive, we also reject the Coalition's argument that the Agencies exceeded their statutory authority in promulgating the list. As we have explained, areas of a

---

[40] As the list is non-exhaustive, it can be expanded in one of two ways: (1) rulemaking—*i.e.*, an amendment to the regulation; or (2) the adjudicatory process. The second method is the likely avenue where the well operator and the Department disagree over the extent of the well operator's post-drilling restoration obligation under Section 3216(c) of Act 13 and Section 78a.65(a)(1) of the Unconventional Well Regulations.

well site necessary for safe production must, under any reasonable reading, be included within the broader category of areas "needed for production" under Section 3216(c) of Act 13. Given that Section 78a.65(a)(1)(iv) of the Unconventional Well Regulations identifies, in an non-exhaustive way, areas of a well site that fall within the statutorily-defined area that need not be restored post-drilling, it does not exceed the statutory authority. Accordingly, Section 78a.65(a)(1)(iv) survives the Coalition's challenge under the first *Tire Jockey* standard.

Turning to the portion of the regulation requiring well operators to restore areas to AOC within 9 months after completion of drilling, we find that this requirement conflicts with the site restoration scheme set forth in Section 3216 of Act 13. As the Agencies recognize, restoration to AOC is compelled by the statute only where the well operator seeks an extension of the 9-month post-drilling restoration period. (*See* Agencies' Br. in Supp. at 62.) In making such a request, the well operator must submit a site restoration plan to the Department that provides for, *inter alia*, "returning the portions of the site not occupied by production facilities or equipment to *approximate original contours* and *making them capable of supporting the uses that existed prior to drilling the well*." 58 Pa. C.S. § 3216(g)(2)(ii) (emphasis added).

The phrase "approximate original contours" is not defined in Act 13. The Unconventional Well Regulations define "AOC" as follows:

> Reclamation of the land affected to *preconstruction contours* so that it closely resembles the general surface configuration of the land prior to construction activities and blends into and complements the drainage pattern of the surrounding terrain, and *can support the land uses that existed prior to the applicable oil and gas operations to the extent practicable*.

56

25 Pa. Code § 78a.1 (definitions) (emphasis added). In our assessment, there is no material distinction between the regulatory definition of AOC and the restoration standard set forth in Section 3216(g)(2)(ii) of Act 13.

The site restoration regulation requires all well operators to complete a site restoration plan. It further requires well operators to begin restoration within 9 months after the completion of drilling. All restoration plans must provide for the restoration of certain areas of the well site to AOC. 25 Pa. Code § 78a.65(b)(1). This requirement is inconsistent with the statute, which requires post-drilling restoration to AOC *only* where the well operator seeks an extension of the 9-month restoration period. 58 Pa. C.S. § 3216(g). In Section 3216 of Act 13, the General Assembly chose to require prompt post-drilling site restoration. Where appropriate, however, the General Assembly also authorized the Department to extend the time period for post-drilling site restoration by up to two years, *but only if the well operator agreed to meet a heightened site restoration standard—i.e.*, AOC. The site restoration regulation ignores this distinction by making restoration to AOC mandatory, whether within the original statutory post-drilling restoration period or an extended period at the request of the well owner or operator. Because Section 78a.65(b)(1) of the Unconventional Well Regulations is in conflict with the post-drilling site restoration scheme set forth in Section 3216 of Act 13, it fails under the first *Tire Jockey* standard.

For these reasons, we will grant the Agencies' application for summary relief with respect to the Coalition's claim that the Agencies lack the statutory authority to promulgate Section 78a.65(a)(1)(iv) of the Unconventional Well Regulations (defining site restoration areas "necessary to safely operate the well"), and we will deny the Coalition's cross-application with respect to that claim.

57

Further, we will grant the Coalition's application for summary relief with respect to the Coalition's claim that the Agencies lack the statutory authority to promulgate Section 78a.65(b)(1) of the Unconventional Well Regulations (requiring post-drilling site restoration within the statutory 9-month period to AOC), and we will deny the Agencies' application with respect to that claim.

### 2. *Vagueness—Subsection (b)*

In their application for summary relief, the Agencies also seek summary relief with respect to paragraph 66 of the Petition, which provides:

> 66. Section 78[a].65(b) [of the Unconventional Well Regulations] requires a duplicative site restoration plan, in addition to the site restoration plan required under [The] Clean Streams Law, for well sites over five acres. Section 78[a].65(b) exceeds the statutory authority provided in Act 13, Section 3216, which requires operators to comply with [The] Clean Streams Law and its regulations for earth disturbance related to oil and gas operations.

The Agencies contend that Section 78a.65(b)(8) of the Unconventional Well Regulations provides that a restoration plan under Section 78a.65(b) may be used by the permittee to demonstrate compliance with the site restoration plan requirements in Section 102.8 of the E&S/PCSM Regulations, 25 Pa. Code § 102.8, part of the Department's general erosion and sediment control regulations. In this regard, Section 78a.65(b)(8) provides: "An operator of a well site who [sic] is required to obtain a permit under § 102.5(c) (relating to permit requirements) may develop a written restoration plan containing drawings and a narrative that address the requirements of paragraphs (1)-(7) to demonstrate compliance with § 102.8(n)." 25 Pa. Code § 78a.65(b)(8).

In response, and in support of its cross-application, the Coalition characterizes its claim in paragraph 66 as a challenge to the site restoration plan

58

requirement in Section 78a.65(b) of the Unconventional Well Regulations on vagueness grounds. Specifically, the Coalition argues that the provision is "unconstitutionally vague because it is not clear on the face of the regulation if the restoration plan developed under 25 Pa. Code Ch. 102 and the Erosion and Sedimentation Control General Permit . . . satisfies Section 78a.65(b)." (Coalition Br. in Opp'n at 55.) In support, the Coalition cites the testimony of Scott Perry, the Department's Deputy Secretary for the Office of Oil and Gas Management (Secretary Perry), from the preliminary injunction hearing. On this subject, Secretary Perry testified:

> Q      If you turn to 6500 in the Pennsylvania Bulletin, it's the subpart [Section 78a.65](b) in the top left column. It says, Restoration plan. Do you see that part?
>
> A      Yes.
>
> Q      So when you said this was a codification of existing law and policy, is this a different restoration plan that's required under Clean Streams, Chapter 102 [(the E&S/PCSM Regulations)], and/or permitting?
>
> A      I don't believe so.
>
> Q      You believe it's the same restoration plan that's required where? Where is it already required?
>
> A      Under the erosion and sediment control permits.
>
> Q      Okay. So restoration is not defined by Act 13, is it?
>
> A      No, it is not, which is why we needed to add clarification in this rule.
>
> Q      So restoration has been subject to the terms and conditions of permits when it's over five acres?
>
> A      Correct.
>
> Q      And Act 13 addressed the small sites with the provisions that you mentioned about filling pits and removing equipment?

59

A    I don't know.  It applies to both small and large sites.

Q    No, I understand.  But if a site didn't have to get a permit under 102 --

A    So --

Q    -- it still would have an obligation under Act 13?

A    Correct.

Q    Okay.  And your understanding is that this restoration plan is the same as something that's already required elsewhere?

A    That is my understanding.  I may be mistaken, but that's my understanding.

(Mosites Suppl. Aff. Ex. 28, Hr'g Tr. 174:14-175:22.)  In the Coalition's view, Secretary Perry's testimony is equivocal on the question of whether the Unconventional Well Regulations require a duplicative site restoration plan.  This, the Coalition contends, supports its vagueness challenge.  The Coalition further argues that Section 78a.65(b)(8), cited by the Agencies, does not clarify the fatal ambiguity.

There is a strong presumption that legislative enactments are constitutional.  For that reason, a constitution challenge can succeed only when the challenger demonstrates that the law clearly, plainly, and palpably violates the Pennsylvania Constitution.  *See London v. Zoning Bd. of Phila.*, 173 A.3d 847, 850-51 (Pa. Cmwlth. 2017).  The void-for-vagueness doctrine is grounded in procedural due process protections.  As explained by the Pennsylvania Supreme Court:

> A law is void on its face if it is so vague that persons "of common intelligence must necessarily guess at its meaning and differ as to its application."  The void for vagueness doctrine incorporates the due process notions of fair notice or warning . . . .  [I]n reviewing a void for

60

vagueness challenge, we must consider both the essential fairness of the law and the impracticability of drafting the legislation with greater specificity.

Although at first blush a law may appear vague on its face and those subject to it without fair notice, however, it may withstand a constitutional challenge if it has been narrowed by judicial interpretation, custom and usage . . . .

*Fabio v. Civil Serv. Comm'n of Phila.*, 414 A.2d 82, 84-85 (Pa. 1980) (citations and footnote omitted) (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)).

To better understand the Coalition's claim, we begin with the E&S/PCSM Regulations (25 Pa. Code Ch. 102), promulgated, at least in part, under The Clean Streams Law. The E&S/PCSM Regulations impose certain obligations on those that conduct earth disturbance activities to mitigate the impact of those activities on the waters of the Commonwealth through the use of BMPs to control erosion, sedimentation, and post-construction stormwater runoff. 25 Pa. Code § 102.2(a). Section 102.4 of the E&S/PCSM Regulations sets forth the requirements governing E&S controls. *Id.* § 102.4. Under certain circumstances, the E&S/PCSM Regulations require the person that proposes earth disturbance activities to prepare and implement an E&S plan, which is "[a] site-specific plan consisting of both drawings and a narrative that identifies BMPs to minimize accelerated erosion and sedimentation before, during and after earth disturbance activities." *Id.* § 102.1 (definitions). Sections 102.5 through 102.7 of the E&S/PCSM Regulations set forth permit requirements for earth disturbance activities. *Id.* §§ 102.5-.7. Under Section 102.5(c), an E&S permit is only required for proposed oil and gas activities "that involve 5 acres (2 hectares) or more of earth disturbance over the life of the project." *Id.* § 102.5(c).

Most relevant to the Coalition's vagueness challenge is Section 102.8 of the E&S/PCSM Regulations, which sets forth the requirements for

61

PCSM planning and design. *Id.* § 102.8. Section 102.8 generally requires those that engage in permitted earth disturbance activities under the E&S/PCSM Regulations to develop and implement a PCSM plan with respect to those activities. A PCSM plan is a "[a] site-specific plan consisting of both drawings and a narrative that identifies BMPs to manage changes in stormwater runoff volume, rate and water quality after earth disturbance activities have ended and the project site is permanently stabilized." *Id.* § 102.1 (definitions). Under Section 102.8(f), all PCSM plans must meet certain minimum requirements. *Id.* § 102.8(f). Section 102.8(g) requires some PCSM plans to include additional information, relating to pre-development and post-development stormwater analysis of the site. *Id.* § 102.8(g). "*[R]egulated activities that require site restoration or reclamation*, and small earth disturbance activities identified in subsection (n)," however, need not supply this additional information. *Id.* (emphasis added). Instead, such activities are subject to Section 102.8(n), which provides, in relevant part:

> The portion of a site reclamation or restoration plan that identifies PCSM BMPs to manage stormwater *from oil and gas activities . . . that require compliance with this chapter*, may be used to satisfy the requirements of this section if the PCSM, reclamation or restoration plan meets the requirements of subsections (b), (c), (e), (f), (h), (i) and (l) and, when applicable, subsection (m).

*Id.* § 102.8(n) (emphasis added).

The Coalition's vagueness challenge appears to be born out of concern that an unconventional well owner and operator with an E&S permit for the well site under the E&S/PCSM Regulations would have to submit a PCSM plan in compliance with Section 102.8 of the E&S/PCSM Regulations *as well as, or in addition to*, a restoration plan in compliance with Section 78a.65(b) of the Unconventional Well Regulations—hence, duplicative plans. Sections 102(f)

62

and (n) of the E&S/PCSM Regulations, however, recognize that there may be regulated activities that separately require preparation of site restoration or reclamation plans. In that situation, the site restoration or reclamation plan specially required for that regulated activity may be used to satisfy the requirements of a PCSM plan under Section 102.8(n) of the E&S/PCSM Regulations, so long as the site restoration or reclamation plan meets the requirements of certain subsections of Section 102.8. Section 78a.65(b)(8) of the Unconventional Well Regulations is harmonious with this reading of Section 102.8 of the E&S/PCSM Regulations.

Read together, then, Section 102.8 of the E&S/PCSM Regulations, particularly subsections (g) and (n), and Section 78a.65(b)(8) of the Unconventional Well Regulations expressly address the circumstance where a well owner or operator may be required to prepare both a PCSM plan and a restoration plan and how it can prepare a single plan that complies with Section 78a.65 of the Unconventional Well Regulations and the E&S/PCSM Regulations. As the Coalition has not convinced us that there is any facial ambiguity in this scheme, we will grant the Agencies' application for summary relief with respect to the Coalition's vagueness challenge and deny the Coalition's cross-application with respect to that claim.

### 3. *Authority—Subsection (d)*

Section 78a.65(d) of the Unconventional Well Regulations, 25 Pa. Code § 78a.65(d), titled "[a]reas not restored," is directed to disturbed areas of the well site that are not included in the site restoration plan required under subsection (b), as well as "other remaining impervious surfaces." The Coalition argues that this provision is contrary to law and, therefore, must be stricken. *See Slippery Rock*, 983 A.2d at 1241.

The Coalition characterizes Section 102.8(n) of the E&S/PCSM Regulations as an "exemption" for oil and gas well site restoration plans from the

63

more onerous PCSM plan requirements set forth in Section 102.8(g). It argues that Section 78a.65(d) of the Unconventional Well Regulations improperly limits, or eliminates entirely, this exemption for oil and gas activities, giving rise to a conflict. Section 78a.65(d) provides:

> Disturbed areas associated with well sites *that are not included in a restoration plan, and other remaining impervious surfaces*, must comply with all requirements in [Title 25,] Chapter 102 [of the Pennsylvania Code] (relating to erosion and sediment control). The PCSM plan provisions in [25 Pa. Code] § 102.8(n) apply only to the portions of the restoration plan that provide for restoration of disturbed areas to meadow in good condition or better or otherwise incorporate ABACT or nondischarge PCSM BMPs.

25 Pa. Code § 78a.65(d). The Coalition further contends that the first sentence of the regulation "defies all comprehension" and is "meaningless," because *all* disturbed areas associated with a well site are included in well site restoration plans. (Coalition Br. in Supp. at 26.) The Coalition also contends that since 2012, the Department has required the oil and gas industry to comply with the Section 102.8(g) requirements as part of the E&S permit process, in violation of the Section 102.8(n) exemption.

The Coalition also takes aim at the second sentence of Section 78a.65(d) of the Unconventional Well Regulations, arguing that the language improperly limits the scope of the Section 102.8(n) exemption to site restoration post-plugging by referencing the "meadow in good condition or better" standard. The Coalition contends that Section 102.8(n) of the E&S/PCSM Regulations is written to apply to all phases of oil and gas well site restoration, not just post-plugging. Finally, the Coalition contends that Section 78a.65(d) improperly imposes restoration requirements on well sites that are exempt from the

64

permitting requirements under the E&S/PCSM Regulations due to their size (*i.e.*, less than 5 acres).

In response, and in support of their cross-application, the Agencies again emphasize that their authority to promulgate regulations directed to oil and gas well restoration exists under both Act 13 and The Clean Streams Law. The Agencies disagree with the Coalition's claim that Section 78a.65(d) of the Unconventional Well Regulations conflicts with The Clean Streams Law or even the E&S/PCSM Regulations. Rather, the Agencies argue that Section 78a.65(d) recognizes that, unlike traditional development, site restoration for unconventional well operations is oftentimes incremental, owing to the varying stages of site development—*i.e.*, drilling, production, plugging. The Agencies claim that the site restoration plan required in Section 78a.65(b) addresses *only* post-drilling restoration—*i.e.*, restoration of areas not necessary for production. Section 78a.65(d), then, addresses only disturbed areas that remain on the well site after post-drilling restoration—*i.e.*, those areas necessary for production.

With respect to the portion of Section 78a.65(d) of the Unconventional Well Regulations that requires post-drilling restoration of disturbed areas to "meadow in good condition or better," the Agencies argue that "meadow in good condition" is a stormwater performance standard also found in the E&S/PCSM Regulations, specifically Section 102.8(g) of the E&S/PCSM Regulations. Accordingly, Section 78a.65(d) appropriately, in the Agencies' view, requires well owners and operators to achieve the same restoration standard required by the E&S/PCSM Regulations, while also exempting, under Section 102.8(n) of the E&S/PCSM Regulations, well owners and operators from having to include in their

Section 78a.65(b) restoration plans the calculations and analyses required under Section 102.8(g).

Alternatively, assuming there is a conflict between Section 78a.65(d) of the Unconventional Well Regulations and Section 102.8(n) of the E&S/PCSM Regulations, citing portions of the Statutory Construction Act of 1972,[41] the Agencies contend that the special provision regulating PCSM for unconventional oil and gas well development, Section 78a.65(d), must control over the more general provision, Section 102.8, regulating PCSM generally. *See* 1 Pa. C.S. § 1933.[42] Alternatively, as Section 78a.65(d) is the more recent provision, the Agencies contend it should control over Section 102.8, originally promulgated in August 2010.

In reply to the Agencies' statutory construction argument, the Coalition contends that the Agencies fail to recognize that Section 78a.65(d) of the Unconventional Well Regulations conflicts with both Section 102.8(n) of the E&S/PCSM Regulations and Section 3216(e) of Act 13, which, according to the Coalition, "requires all restoration activities to be undertaken in accordance with [T]he Clean Streams Law." (Coalition Br. in Opp'n at 50.) Relying on this provision of Act 13, the Coalition presses its argument that The Clean Streams Law includes

---

[41] *See also Saturday Family LP v. Cmwlth.*, 148 A.3d 931, 935 (Pa. Cmwlth. 2016) (indicating that rules of statutory construction apply to regulations in Pennsylvania Code).

[42] Section 1933 of the Statutory Construction Act of 1972 provides:

> Whenever a general provision in a statute shall be in conflict with a special provision in the same or another statute, the two shall be construed, if possible, so that effect may be given to both. If the conflict between the two provisions is irreconcilable, the special Provisions shall prevail and shall be construed as an exception to the general provision, unless the general provision shall be enacted later and it shall be the manifest intention of the General Assembly that such general provision shall prevail.

the exemption found in Section 102.8(n) of the E&S/PCSM Regulations, and the Agencies have no authority to change or alter that exemption.

On the question of the authority to promulgate Section 78a.65(d) of the Unconventional Well Regulations, as noted above, we have no difficulty concluding that the EQB possesses the statutory authority to promulgate regulations to implement the site restoration requirements of Section 3216 of Act 13. With respect to the Coalition's conflict claim, the Agencies have the better argument.

A central pillar of the Coalition's conflict argument is that Act 13 is the only source authority for the Unconventional Well Regulations. As we held above, this premise is incorrect. The Agencies promulgated the Unconventional Well Regulations as a means to regulate a particular method of natural gas extraction, not to implement a particular statute. The Unconventional Well Regulations represent the Agencies' efforts to apply numerous statutes within their purview, including, *inter alia*, The Clean Streams Law and Act 13. With respect to well site restoration in particular, Section 3216(a) of Act 13 mandates well site restoration. Section 3216(e) of Act 13 requires: "Restoration activities required by this chapter or in regulations promulgated under this chapter *shall also comply with* all applicable provisions of The Clean Streams Law." (Emphasis added.) The Coalition fails to cite any provision of The Clean Streams Law that conflicts with Section 78a.65(d) of the Unconventional Well Regulations.

As the Coalition points out in its briefs, this Court preliminarily enjoined the Department from enforcing Section 78a.65(d) of the Unconventional Well Regulations, holding that the Coalition had raised a substantial legal question as to whether Section 78a.65(d) abrogates any requirements or exemptions in The Clean Streams Law. *MSC I*, slip op. at 38. In *MSC II*, however, the Pennsylvania

67

Supreme Court reversed, specifically rejecting this Court's concerns about a conflict:

> Unlike with some of the prior counts, the Commonwealth Court's grant of partial interim relief as to Count V was not based on any identified deficiency in the Agencies' statutory authorization to promulgate the rule in question. Rather, the court discerned that a potential conflict existed between Section 78a.65(d) and either [T]he Clean Streams Law or Section 102.8(n)'s limited exemption from compliance with Section 102.8(g)[ of the Unconventional Well Regulations]' additional requirements for a PCSM [plan] developed pursuant to [T]he Clean Streams Law.

> As we read the two regulatory provisions, it does not appear that a conflict exists. Section 78a.65(d) [of the Unconventional Well Regulations] on its face, only applies to impervious surfaces and disturbed areas which are *not* included in a site restoration plan, whereas the exemption reflected in Section 102.8(n) applies to a certain portion of a site restoration plan. Additionally, no Clean Streams Law provision has been identified that may be in conflict with Section 78a.65(d). At most, there may be an incongruity between two regulations—Sections 102.8(n) and 78a.65(d)—but only in the sense that the latter narrows the scope of circumstances in which the former applies. This in itself would be insufficient to show that Section 78a.65(d) is in conflict with (or unauthorized by) a legislative enactment.

> Even if we assume, for decisional purposes, that an irreconcilable conflict exists between the two regulations, it is clear that Section 78a.65(d) [of the Unconventional Well Regulations] must prevail. As the Agencies point out, Section 102.8(n) [of the E&S/PCSM Regulations] applies generally to a number of regulated activities that require site restoration, whereas Section 78a.65(d) applies specifically to unconventional gas well sites. Further, Section 78a.65(d) was enacted later in time than Section 102.8(n). Under these circumstances, Section 78a.65(d), being more specific, takes precedence over Section 102.8(n).

*MSC II*, 185 A.3d at 1006 (emphasis in original).

Although we recognize that the Pennsylvania Supreme Court issued its decision in *MSC II* in the context of ruling on an appeal from the entry of a preliminary injunction, we cannot ignore its analysis and disposition of the Coalition's conflict claim. Adopting the Supreme Court's reasoning in *MSC II*, we hold that the Coalition cannot prevail on its conflict claim. We, therefore, will grant the Agencies' application for summary relief with respect to the Coalition's challenge in Count V of the Petition to the authority of the Agencies to promulgate Section 78a.65(d) of the Unconventional Well Regulations on the basis of a conflict. As a consequence, we will deny the Coalition's application with respect to that same challenge.

### 4. Compliance with Procedures

As noted above, the Coalition seeks a declaration that Section 78a.65 of the Unconventional Well Regulations is unlawful under the second *Tire Jockey* prong because the Agencies promulgated it without first complying with the Regulatory Review Act. It also alleges that subsection (b) of the well site restoration regulation is unlawful under the Commonwealth Documents Law. The parties have filed cross-applications for summary relief on these challenges.

Section 5(a)(4) of the Regulatory Review Act, 71 P.S. § 745.5(a)(4), requires the agency promulgating the regulations to submit to the Legislative Reference Bureau a regulatory analysis form, or RAF, which sets forth, *inter alia*, "[e]stimates of the direct and indirect costs to the Commonwealth, to its political subdivisions and to the private sector." In determining whether the proposed regulation is in the public interest, the IRRC must consider, *inter alia*, the "[e]conomic or fiscal impacts of the regulation, which include . . . [d]irect and indirect costs to the Commonwealth, to its political subdivisions and to the private

sector." Section 5.2(b)(1)(i) of the Regulatory Review Act, added by the Act of December 6, 2002, P.L. 1227, 71 P.S. § 745.5b(b)(1)(i).[43]

The Coalition argues that the Agencies did not provide the required estimate in the RAF for the cost of complying with the site restoration regulation. The Agencies, however, contend that the RAF does, indeed, address the cost of compliance. The Agencies are correct. The RAF provides estimates for the cost of compliance that the Department received from unconventional well operators, which ranged from $200,000 to $300,000 per well pad. (Mosites Suppl. Aff., Ex. G at 100.) The Department, however, rejected those estimates:

> The Department does not agree with these cost estimates. The restoration requirements in this section are not new and do not impose a new cost on the regulated community as explained above . . . .

> This section is intended to provide clarity for implementing existing requirements from both Act 13 and [the E&S/PCSM Regulations]. To the extent that an operator would incur the costs listed above, they would incur those costs regardless of the status of Section 78a.65 [of the Unconventional Well Regulations] because they are costs associated with complying with Act 13 and [the E&S/PCSM Regulations].

---

[43] In its brief in support, the Coalition also cites the Executive Order promulgated through the Office of the Governor in support of its Regulatory Review Act challenge. *See* 4 Pa. Code § 1.374. Whether an executive order has the force and effect of law depends on the type of executive order. An executive order intended only to communicate with subordinate officials is nonjusticiable, whereas an executive order that purports to implement a statute can be enforced in a court of law. *Cutler v. State Civil Serv. Comm'n*, 924 A.2d 706, 712 (Pa. Cmwlth.) (discussing *Shapp v. Butera*, 348 A.2d 910 (Pa. Cmwlth. 1975)), *appeal denied*, 940 A.2d 366 (Pa. 2007). The Coalition does not address this distinction in its brief in support. Nonetheless, the Executive Order also provides: "This subchapter is intended only to improve the internal management of executive agencies and is not intended to create a right or benefit, substantive or procedural, enforceable at law by a party against the Commonwealth, its agencies, its officers or any person." 4 Pa. Code § 1.380(b). Accordingly, the Coalition may not rely on the Executive Order to establish any of the Coalition's claims in this matter.

*The total new cost of this provision is $0.*

(RAF at 101-01 (emphasis in original).)

The Coalition obviously disagrees with the Department's analysis of compliance cost in the RAF. That disagreement alone, however, is not a valid basis to set aside a regulation under the second *Tire Jockey* standard. Disagreement with a cost estimate is, frankly, not the same as the absence of a cost estimate. Any disagreements with an agency's cost estimate should be sorted out by the IRRC, which, as noted above, is compelled by the Regulatory Review Act to consider the fiscal impact of a proposed regulation. Here, the record shows that the RAF included for the IRRC's consideration both the industry's estimated cost of compliance and the Department's estimate. The RAF, therefore, complied with Section 5(a)(4) of the Regulatory Review Act.

In its Petition, the Coalition contends that the well site restoration regulation also violates the Commonwealth Documents Law by enlarging the original purpose of the proposed regulation published for public comment in two ways: (1) by adding a new and duplicative restoration plan requirement, and (2) by eliminating an exemption from post-construction requirements under The Clean Streams Law. (Petition ¶ 71(a)-(b).) The Agencies argue that the changes between the proposed and final rulemaking did not alter the original purpose of the rulemaking. Accordingly, the final rulemaking did not violate the Commonwealth Documents Law. In response, and in support of its cross-application, the Coalition, focusing on Section 78a.65(b) of the Unconventional Well Regulations, argues that because the final rulemaking requires submission of a "separate and distinct" restoration plan from that required by Act 13 or The Clean Streams Law—a requirement omitted from the proposed rulemaking—the Agencies deprived the

71

public, legislative committees, and the IRRC of the opportunity to comment and thus violated the Commonwealth Documents Law. (Coalition Br. in Opp'n at 54-55.)

Generally, before an agency may promulgate a regulation, it must first give the public notice of the proposed rulemaking and an opportunity to provide written comments to the proposed rulemaking. Section 201 of the Commonwealth Documents Law, 45 P.S. § 1201. The promulgating agency must review and consider any written comments that it receives. Section 202 of the Commonwealth Documents Law, *id.* § 1202. Thereafter, the agency may proceed to adopt the regulation in final form. The final form regulation "may contain such modifications to the proposed text . . . as do not enlarge its original purpose, but modifications which enlarge the original purpose of a proposal . . . shall be republished thereunder prior to final adoption." *Id.*

This Court analyzed compliance with the original purpose requirement in *Community Services Management Corporation v. Department of Public Welfare*, 482 A.2d 1192 (Pa. Cmwlth. 1984). On appeal from the denial of a license to operate partial hospitalization programs, the petitioner argued that a regulation requiring accreditation by the Joint Commission on Accreditation of Hospitals (JCAH) violated Section 202 of the Commonwealth Documents Law, because the accreditation requirement was not within the proposed form regulation when published for public comment. We rejected the petitioner's challenge, opining:

> The 8300 series regulations as proposed and adopted were intended to apply to all partial hospitalization facilities providing care and treatment for the mentally ill or emotionally disturbed. The regulations detail mandatory requirements regarding a wide number of areas including, but not limited to, adequate staffing, policies and procedures for patient care, and records keeping. Inasmuch as licensure or certification has been explicitly conditioned upon compliance with the

72

regulations, it is apparent that the purpose of the regulations is to establish standards to be met by those facilities and programs subject to the Department [of Public Welfare's (DPW)] authority. The petitioner has no vested right to receive funds from the [DPW], which may exercise its prerogative to condition receipt of the limited funds at its disposal. We believe, therefore, that the incorporation of further substantive requirements does not alter the [DPW's] intentions to ensure that it receives the services for which it pays. The insertion of the JCAH accreditation requirement does not serve, therefore, to "enlarge the purpose" of the regulations, which, accordingly, we must hold are valid and enforceable.

*Cmty. Servs. Mgmt. Corp.*, 482 A.2d at 1194 (citation omitted).

The Agencies published public notice of their intent to amend the existing oil and gas well regulations to address the passage of Act 13 on December 14, 2013. 43 Pa. B. 7377 (Dec. 14, 2013). The notice contained the following general description of the proposed rulemaking:

> The proposed rulemaking *would update existing requirements regarding* containment of regulated substances, waste disposal, *site restoration* and reporting releases. The proposed rulemaking would establish new planning, notice, construction, operation, reporting and monitoring standards for surface activities associated with the development of oil and gas wells. This includes requirements for freshwater impoundments, centralized impoundments, containment systems and practices for unconventional wells, wastewater processing, borrow pits, gathering lines, horizontal directional drilling, temporary pipelines and road-spreading of brine. The proposed rulemaking would also add new requirements for addressing impacts to public resources, identifying and monitoring orphaned and abandoned wells during hydraulic fracturing activities, and water management planning. These additional requirements will provide increased protection of public health, safety and the environment.

73

*Id.* (emphasis added.)  The notice further provided that the proposed amendments to the existing oil and gas regulations included "new requirements for," *inter alia*, "site restoration."  *Id.*  With respect to the proposed site restoration regulation specifically, the notice provided:  "The proposed amendments to this section would clarify the well site restoration requirements, including when restoration is required if there are multiple wells drilled on a single well site *and what constitutes a restoration after drilling.*"  *Id.* at 7380 (emphasis added).  With respect to post-drilling site restoration, the proposed regulation requires site restoration consistent with the PCSM plan or site restoration plan consistent with Section 102.8 of the E&S/PCSM Regulations.  *Id.* at 7403.

It is undisputed that Section 78a.65(b), the final site restoration regulation in the Unconventional Well Regulations, explicitly requires the preparation of a post-drilling site restoration plan by well owners or operators.  This explicit requirement was not in the proposed regulations.  Nonetheless, as noted above, one of the original purposes of the proposed regulations was to address post-drilling well site restoration.  The proposed regulation, like the final regulation, expressly references site restoration consistent with any site restoration and PCSM plans.  That the new regulation goes further and expressly requires a site restoration plan—*i.e.*, a plan, as noted above, that can also be used to satisfy the PCSM plan requirements under Section 102.8(n) of the E&S/PCSM Regulations—does not enlarge the original purpose of the proposed regulation in derogation of Section 202 of the Commonwealth Documents Law.  *See Cmty. Servs. Mgmt. Corp.,* 482 A.2d at 1194; *see also Brocal Corp. v. Dep't of Transp.*, 528 A.2d 114, 118 (Pa. 1987) ("Purpose refers to the reason for enacting legislation, not the particular

course or scheme chosen to achieve that end.") (opinion announcing the judgment of the court).[44]

For these reasons, we will grant the Agencies' application for summary relief with respect to Count V on the Coalition's challenge based on the second *Tire Jockey* prong—*i.e.*, that the Agencies promulgated the site restoration regulation in violation of the Regulatory Review Act and the Commonwealth Documents Law. Accordingly, we will deny the Coalition's cross-application with respect to that challenge.

### 5. *Reasonableness*

The Coalition contends that the entire site restoration regulation must be set aside as unreasonable under the third *Tire Jockey* standard. Its reasonableness challenge, however, is grounded on the same arguments that undergird its lack of authority/conflict challenges, which we resolved above against the Coalition. We will not engage in a duplicative analysis of these same arguments simply because the Coalition reasserts them under the third *Tire Jockey* standard.

The Coalition also contends that the site restoration regulation is "strikingly" unreasonable based on assertions by the Department that the new regulation merely restates already existing site restoration obligations—*i.e.*, that the new regulation has no impact. (Coalition Br. in Supp. at 41.) In the Coalition's view, "no agency should be allowed to promulgate complex and confusing regulations that it insists have no practical or legal impact on the rights or obligations of the regulated entity." (*Id.* at 41-42.) The Coalition, however, cites no authority in support of this specific contention.

---

[44] Justice Hutchinson authored the Opinion Announcing the Judgment of the Court, in which Justices Flaherty and Zappala joined. Chief Justice Nix concurred, without writing a separate opinion.

In response, the Agencies argue that summary relief on the Coalition's reasonableness challenge is not appropriate because the claim relies on "disputed facts." (Agencies' Br. in Supp. of Resp. to Pet'r's Appl. at 67.) The Agencies, however, do not identify those disputed facts in their brief in opposition.

As noted above, where legislative rules are adopted within the agency's granted power and issued pursuant to proper procedure, they enjoy a presumption of reasonableness. *Pottstown*, 712 A.2d at 743. Whether the Department believes the site restoration regulation imposes new obligations on the unconventional well industry or merely restates/clarifies existing obligations does not appear to us to be a dispositive question on the issue of the reasonableness of the regulation. Instead, as the Agencies point out in their brief in opposition, we must consider "whether the practical application of the regulation is consistent with the express goals of the statute delegating the authority to create the legislative regulation and whether there was factual support or a foundation for the adoption of the regulation." *Pa. Dep't of Health v. N. Hills Passavant Hosp.*, 674 A.2d 1141, 1148 (Pa. Cmwlth.) (citation omitted), *appeal denied*, 686 A.2d 1314 (Pa. 1996). Because the Coalition does not offer anything to aid the Court in conducting this inquiry, we will deny the Coalition's request for summary relief on its reasonableness challenge to the site restoration regulation.

### E. Spill Remediation (Count VI)—Cross-Applications

The spill remediation regulation, Section 78a.66(c) of the Unconventional Well Regulations, 25 Pa. Code § 78a.66(c), requires well operators to remediate areas on or adjacent to a well site or access road polluted by spills or releases and establishes remediation standards and reporting requirements.[45] In

---

[45] Section 78a.66(c) of the Unconventional Well Regulations provides:

(c) *Remediating releases.* Remediation of an area polluted by a spill or release is required. The operator or other responsible party shall remediate a release in accordance with the following:

(1) Spills or releases to the ground of less than 42 gallons at a well site that do not pollute or threaten to pollute waters of the Commonwealth may be remediated by removing the soil visibly impacted by the spill or release and properly managing the impacted soil in accordance with the Department's waste management regulations. The operator or responsible party shall notify the Department of its intent to remediate a spill or release in accordance with this paragraph at the time the report of the spill or release is made.

(2) For spills or releases to the ground of greater than or equal to 42 gallons or that pollute or threaten to pollute waters of the Commonwealth, the operator or other responsible person must demonstrate attainment of one or more of the standards established by Act 2 and [Title 25,] Chapter 250 (relating to administration of Land Recycling Program) [of the Pennsylvania Code] in the following manner:

(i) Within 15 business days of the spill or release, the operator or other responsible party shall provide an initial written report that includes, to the extent that the information is available, the following:

(A) The regulated substance involved.

(B) The location where the spill or release occurred.

(C) The environmental media affected.

(D) Pollution or threatened pollution of water supplies.

(E) Impacts to buildings or utilities.

(F) Interim remedial actions planned, initiated or completed.

(G) A summary of the actions the operator or other responsible party intends to take at the site to address the spill or release such as a schedule for site characterization, to the extent known, and the anticipated time frames within which it expects to take those actions.

(ii) After the initial report, any new pollution or other impacts identified or discovered during interim remedial actions or

77

paragraph 76 of its Petition, the Coalition challenges the regulation under the first *Tire Jockey* standard, claiming that the Agencies have no authority to require unconventional well owners and operators to follow the remediation processes set forth in the Land Recycling and Environmental Remediation Standards Act, commonly referred to as Act 2. The Coalition also contends that the regulation is an unconstitutional special law under Article III, Section 32 of the Pennsylvania

---

site characterization shall also be reported in writing to the Department within 15 business days of their discovery.

(iii) Within 180 calendar days of the spill or release, the operator or other responsible party shall perform a site characterization to determine the extent and magnitude of the pollution and submit a site characterization report to the appropriate Department regional office describing the findings. The time to submit the site characterization report may be extended by the Department. The report must include a description of any interim remedial actions taken.

(iv) The report under subparagraph (iii) may be considered to be a final remedial action completion report if the interim remedial actions meet all of the requirements of an Act 2 cleanup standard.

(v) If the site characterization indicates that the interim remedial actions taken did not adequately remediate the spill or release, the operator or other responsible party shall develop and submit a remedial action plan to the appropriate Department regional office for approval. The plan is due within 45 calendar days of submission of the site characterization to the Department. Remedial action plans must contain the elements outlined in [25 Pa. Code] § 245.311(a) (relating to remedial action plan), as well as a schedule for the submission of remedial action progress reports.

(vi) Within 45 days after the selected remediation standard has been attained, the operator or other responsible party shall submit a remedial action completion report to the appropriate Department regional office for approval. Remedial action completion reports shall contain the elements outlined in [25 Pa. Code] § 245.313(b) (relating to remedial action completion report).

78

Constitution. Under the second *Tire Jockey* standard, the Coalition argues that the Agencies violated the Regulatory Review Act by failing to include cost of compliance estimates in the RAF. Under the third *Tire Jockey* standard, the Coalition argues that the regulation is unreasonable because it imposes unique remediation obligations on the oil and gas industry without justification, essentially recasting its constitutional claim as a reasonableness challenge.

The Coalition seeks summary relief with respect to all of its claims in Count VI. The Agencies seek summary relief with respect to the Coalition's challenges under the first (lack of authority) and second (proper procedures) *Tire Jockey* standards. Notwithstanding the parties' shared desire that this Court rule now on the validity of the spill remediation regulation, we exercise our discretion and decline to do so pre-enforcement under the Declaratory Judgments Act. *Cf. EQT I*, 130 A.3d at 759; *Bayada Nurses*, 8 A.3d at 875-76; *Arsenal Coal*, 477 A.2d at 1338-40. The *Arsenal Coal* line of cases, which recognizes an exception to our general rule disfavoring pre-enforcement judicial intervention, requires some immediate obligation or threat posed by the challenged agency action. Here, absent a regulated spill, no immediate obligation flows to the industry to comply with the spill remediation regulation and thus no current hardship is evident. Moreover, unlike the facts in *EQT I*, where the petitioner seeking pre-enforcement review was operating under an immediate threat by the Department of a multi-million dollar penalty assessment, beyond the mere existence of the spill remediation regulation, *EQT I*, 130 A.3d at 759, we do not perceive any current threat to the industry that would justify pre-enforcement intervention.

For these reasons, we will deny the cross-applications for summary relief on ripeness and exhaustion of administrative remedies grounds.

## F. Waste Reporting (Count VII)—Agencies' Application

The waste reporting regulation, Section 78a.121(b) of the Unconventional Well Regulations, 25 Pa. Code § 78a.121(b), requires each operator of an unconventional well to include within its *monthly* production and status report for each well

> information on the amount and type of waste produced and the method of waste disposal or reuse, including the specific facility or well site where the waste was managed. Waste information submitted to the Department in accordance with this subsection is deemed to satisfy the residual waste biennial reporting requirements of [25 Pa. Code] § 287.52 (relating to biennial report).

In Count VII of the Petition, the Coalition articulates three separate legal challenges to this regulation. (Petition ¶ 80(a)-(c).) First, the Coalition argues that imposing a monthly reporting requirement for waste conflicts with the Unconventional Well Report Act (Report Act),[46] which requires operators of unconventional wells to file with the Department monthly reports "specifying the amount of production on the most well-specific basis available" but does not mention waste reporting. Section 3(a) of the Report Act, 58 P.S. § 1003(a). Next, the Coalition contends that the regulation conflicts with the residual waste reporting requirement under Section 287.52 of the Residual Waste Management Regulations, which requires only a biennial report of waste production. Third, the Coalition challenges the reasonableness of the requirement, contending that it "imposes excessive costs with no discernable benefit" and imposes reporting requirements on the oil and gas industry "that are stricter than those for any other industry in the Commonwealth." (Petition ¶ 80(b).)

---

[46] Act of October 22, 2014, P.L. 2853, 58 P.S. §§ 1001-1003.

The Agencies seek summary relief on only the Coalition's claims that the waste reporting regulation conflicts with the Report Act and the reporting requirement in the Residual Waste Management Regulations. These challenges go to the authority of the Agencies to promulgate the regulation. As a general principle, the Department has the authority to require those that, *inter alia*, use or dispose of solid waste to submit reports of their activities to the Department. In this regard, Section 608(2) of the SWMA, 35 P.S. § 6018.608(2), provides:

> The [D]epartment and its agents and employees *shall*:
>
> . . . .
>
> (2)    Require any person or municipality engaged in the storage, transportation, processing, treatment, beneficial use or disposal of any solid waste to establish and maintain such records and make such reports and furnish such information *as the [D]epartment may prescribe.*

(Emphasis added.)  Section 287.52 of the Residual Waste Management Regulations, promulgated under the authority, *inter alia*, of the SWMA, requires residual waste generators to file biennial reports with the Department (by March 1 of each odd-numbered year), detailing, *inter alia*, the amount and type of residual waste generated and method of disposal.  The Department last amended the Residual Waste Management Regulations in 2001.  *See* 31 Pa. B. 235 (Jan. 13, 2001).

In applying for summary relief, the Agencies first contend that the waste reporting regulation, which requires unconventional well operators to include waste reporting in their monthly production reports, is authorized by Section 608(2) of the SWMA and Section 3258(a) of Act 13, 58 Pa. C.S. § 3258(a).[47]

---

[47] Section 3258(a) of Act 13 provides:

In response, the Coalition acknowledges that Section 608(2) of the SWMA authorizes the Department to require waste reporting as it may prescribe without "any limiting principle in the language itself." (Coalition Br. in Opp'n at 64.) Nonetheless, the Coalition notes that the statute does not expressly authorize the Department to require monthly reporting and should not be read to authorize the Department to impose a heightened reporting obligation on a particular industry. Section 3258(a) of Act 13, the Coalition argues, provides only for inspection, sampling, and examination to determine compliance with Act 13. It does not authorize the Department to require the creation of records or reports.

While the Agencies' reliance on Section 3258(a) of Act 13 as source authority to promulgate the waste reporting regulation is unavailing for the reasons advanced by the Coalition and as supported by the plain and unambiguous text of the statute, the Agencies' citation to Section 608(2) of the SWMA as source authority is persuasive. Without question, Section 608(2) of the SWMA grants the Department broad authority to prescribe the nature and frequency of reporting obligations for regulated waste handling activities. Like Section 287.52 of the Residual Waste Management Regulations (relating to biennial report), the waste reporting regulation in the Unconventional Well Regulations falls within the Department's granted power under Section 608(2) of the SWMA. The Coalition's argument that the regulation improperly targets the unconventional well industry with heightened reporting obligations goes to the reasonableness of the regulation,

The [D]epartment may make inspections, conduct tests or sampling or examine books, papers and records pertinent to a matter under investigation under this chapter to determine compliance with this chapter. For this purpose, the duly authorized agents and employees of the [D]epartment may at all reasonable times enter and examine any involved property, facility, operation or activity.

82

not the authority of the Department to promulgate the rule. The merit of the Coalition's reasonableness challenge is not presently before the Court.

This brings us to the Coalition's conflict claim—that the waste reporting regulation conflicts with (a) Section 287.52 of the Residual Waste Management Regulations, and (b) the Report Act. The Agencies concede, as they must, that the waste reporting regulation requires the unconventional well industry to submit more frequent waste reports (monthly) than what is otherwise required under Section 287.52 of the Residual Waste Management Regulations (biennially). They argue, nonetheless, that the conflict, such as it is, is readily resolved by application of statutory construction principles. Section 78a.121(b) of the Unconventional Well Regulations, as the later-enacted regulation and one specifically addressed to unconventional well operations, prevails over the more general and earlier-enacted Section 287.52. *See MSC II*, 185 A.3d at 1006. In response, the Coalition essentially argues only that the regulation is unreasonable and, thus, that the Department lacks authority to impose a greater waste reporting obligation on the unconventional oil and gas industry.

Consistent with the Pennsylvania Supreme Court's guidance in *MSC II*, any conflict between the waste reporting requirement in Section 78a.121(b) of the Unconventional Well Regulations and the waste reporting requirement in Section 287.52 of the Residual Waste Management Regulations does not render Section 78a.121(b) invalid. Rather, Section 78a.121(b) prevails over the more general provision.[48] We thus reject this particular aspect of the Coalition's conflict challenge.

---

[48] We note as well that the waste reporting regulation expressly provides that the monthly reporting required under that section "is deemed to satisfy the residual waste biennial reporting

With respect to the Report Act, the Agencies argue that there is no conflict between the Report Act's mandate that unconventional well operators provide monthly production reports and the waste reporting regulation's mandate that the operators include in those monthly reports information about the waste used, produced, and disposed of at the well site. The Report Act does not address waste reporting at all. In response, the Coalition contends that when the General Assembly enacted the Report Act in 2014, it did so knowing that the regulation addressing reporting for conventional and unconventional oil and gas development at that time required production and waste reporting relating to natural gas extracted from the Marcellus shale formation only every six months.[49] By enacting a law that only changed the production reporting requirement to a monthly, rather than semiannual,

requirements of [25 Pa. Code] § 287.52 (relating to biennial report)," defeating any claim by the Coalition that the regulation imposes a duplicative reporting requirement. 25 Pa. Code § 78a.121(b).

[49] As part of the Final Rulemaking, the EQB simultaneously promulgated the Unconventional Well Regulations, challenged here, and amendments to Chapter 78 of the Pennsylvania Code. 46 Pa. B. 6431 (Oct. 8, 2016). Before the Final Rulemaking, conventional and unconventional well development were both regulated under Chapter 78. With respect to reporting, at that time the relevant regulation provided:

> The well operator shall submit an annual production and status report for each permitted or registered well on an individual basis, on or before February 15 of each year. *The operator of a well permitted to produce gas from the Marcellus shale formation shall submit a production and status report for each well on an individual basis, on or before February 15 and August 15 of each year.* Production shall be reported for the preceding calendar year or in the case of a Marcellus shale well, for the preceding 6 months. When the production data is not available to the operator on a well basis, the operator shall report production on the most well-specific basis available. The annual production report must include information on the amount and type of waste produced and the method of waste disposal or reuse. *Waste information submitted to the Department in accordance with this subsection is deemed to satisfy the residual waste biennial reporting requirements of* [25 Pa. Code] § 287.52 (relating to biennial report).

25 Pa. Code § 78.121(a) (emphasis added) (amended Oct. 8, 2016).

84

requirement, the Coalition reasons that the General Assembly deliberately changed only the production requirement in the Report Act from semiannual to monthly, evidencing its legislative intent to maintain the 6-month reporting requirement for waste.

As noted above, the process of statutory construction is an exercise in ascertaining the intent of the General Assembly. 1 Pa. C.S. § 1921(a). Where that intent is not readily apparent from the text, we resort to certain tools to divine the General Assembly's intent and thus the meaning of ambiguous statutory language. *Id.* § 1921(c). In support of its conflict argument with respect to the Report Act, the Coalition advances and relies on one of those tools. That tool is a presumption that when the General Assembly enacts a statute it is presumed to know the current state of the law, including any judicial interpretations of the language used in the statute in question. Applying this presumption, courts will assume that in subsequent enactments, the General Assembly intended that the same construction be applied to such language. *See* 1 Pa. C.S. § 1922(4); *Cmwlth. v. McClintic*, 909 A.2d 1241, 1251-52 (Pa. 2006) (citing *Knox v. Bd. of Sch. Dirs. of Susquenita Sch. Dist.*, 888 A.2d 640 (Pa. 2005)).

The Coalition's claim of a conflict between the Report Act and the waste reporting regulation fails because the Report Act is not ambiguous on its face. It addresses only production reporting, not waste reporting. We refuse to read this straightforward statute dealing with the single subject of production reporting as a tacit expression of intent by the General Assembly to bar the Department, by way of subsequent regulation, from requiring unconventional well operators to also provide waste reports on a monthly basis. This would be a tortured application of statutory

85

construction principles. Accordingly, we see no conflict between the waste reporting regulation and the Report Act.

For these reasons, we will grant the Agencies' application for partial summary relief with respect to the portion of Count VII of the Petition that challenges the authority of the Agencies to promulgate the waste reporting regulation under the first *Tire Jockey* standard.

## V. CONCLUSION

In sum, and upon thorough consideration of the parties' cross-applications for summary relief, directed to claims set forth in Counts II through VII of the Petition, we grant the cross-applications in part and deny them in part.

With respect to Count II (area of review), the Court will grant the Agencies' application for partial summary relief with respect to the Coalition's claim that the Agencies lack statutory authority to promulgate Sections 78a.52a(a), (b), (c)(1)-(2), (4)-(6), (d), and (e) of the Unconventional Well Regulations. Accordingly, we will deny the Coalition's request that we declare those sections of the Unconventional Well Regulations invalid under first *Tire Jockey* standard. We will deny the Agencies' application for partial summary relief directed to Sections 78a.52a(c)(3) and 78a.73(c) and (d) of the Unconventional Well Regulations.

With respect to Count III (on-site processing regulation), the Court will deny the Coalition's application for summary relief and grant the Agencies' cross-application. Accordingly, we will deny the Coalition's request that we declare Section 78a.58(f) of the Unconventional Well Regulations unlawful, void, and unenforceable.

86

With respect to Count IV (well development and centralized impoundments), the Court will grant the Agencies' application for summary relief with respect to the Coalition's claim that the Agencies lack the statutory authority to promulgate Sections 78a.59b (well development impoundments) and 78a.59c (centralized impoundments) of the Unconventional Well Regulations. Accordingly, we will deny the Coalition's request that we declare those regulations invalid under the first *Tire Jockey* standard. In all other respects, we will deny the Agencies' application for summary relief.

With respect to Count V (site restoration), the Court will grant the Agencies' application for summary relief with respect to the Coalition's claim that the Agencies lack the statutory authority to promulgate Section 78a.65(a)(1)(iv) of the Unconventional Well Regulations, and we will deny the Coalition's request that we declare that section invalid under the first *Tire Jockey* standard. We will grant the Coalition's application for summary relief on the Coalition's claim that the Agencies lack the statutory authority to promulgate Section 78a.65(b)(1) of the Unconventional Well Regulations. Accordingly, we will declare void and unenforceable Section 78a.65(b) to the extent that it requires post-drilling site restoration within the statutory 9-month period to AOC. We will grant the Agencies' application for summary relief with respect to the Coalition's vagueness challenge to Section 78a.65(b). Accordingly, we will deny the Coalition's request that we declare that provision void for vagueness. We will also grant the Agencies' application for summary relief on the Coalition's claim that the Agencies lack the statutory authority to promulgate Section 78a.65(d) of the Unconventional Well Regulations due to a conflict with a statute or regulation. Accordingly, we will deny the Coalition's request that we declare that provision invalid under the first *Tire*

*Jockey* standard due to a conflict with existing law. We will also grant the Agencies' application for summary relief on the Coalition's claim that the Agencies failed to follow proper procedures in promulgating Section 78a.65 of the Unconventional Well Regulations. Accordingly, the Coalition's request that we declare that section invalid under the third *Tire Jockey* standard will be denied. In all other respects, we will deny the cross-applications.

With respect to Count VI (spill remediation), we will deny the cross-applications for summary relief on ripeness and exhaustion of administrative remedies grounds.

With respect to Count VII (waste reporting), the Court will grant the Agencies' application for summary relief with respect to the Coalition's claim that the Agencies lack the statutory authority to promulgate Section 78a.121(b) of the Unconventional Well Regulations based on conflicts between that regulation and the Report Act, on one hand, and the Section 287.52 of the Residual Waste Management Regulation on the other hand. Accordingly, we will deny the Coalition's request that we declare those regulations invalid under the first *Tire Jockey* standard due to these alleged conflicts.

P. KEVIN BROBSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

The Marcellus Shale Coalition, :
                       Petitioner :
                                  :
         v. : No. 573 M.D. 2016
                                  :
Department of Environmental :
Protection of the Commonwealth :
of Pennsylvania and Environmental :
Quality Board of the Commonwealth :
of Pennsylvania, :
                     Respondents :

## O R D E R

AND NOW, this 22nd day of July, 2019, upon consideration of the parties' cross-applications for partial summary relief, the cross-applications are GRANTED IN PART and DENIED IN PART.

Petitioner's Application for Partial Summary Relief on Counts III, V, and VI of the Petition for Review is GRANTED only as to Count V and only as follows: Subsection (b) of 25 Pa. Code § 78a.65 is hereby declared VOID and UNENFORCEABLE to the extent that it requires post-drilling site restoration within the statutory 9-month period to approximate original conditions/contours. In all other respects, Petitioner's application is DENIED.

Respondents' Joint Application for Partial Summary Relief: Counts II-VII is GRANTED as follows:

1. Petitioner's request in Count II of the Petition for Review for a declaratory judgment that Subsections (a), (b), (c)(1)-(2), (4)-(6), (d), and (e)

of 25 Pa. Code § 78a.52a are void and unenforceable owing to a lack of agency authority is DENIED.

2. Petitioner's request in Count III of the Petition for Review for a declaratory judgment is DENIED.

3. Petitioner's request in Count IV of the Petition for Review for a declaratory judgment that 25 Pa. Code §§ 78a.59b (well development impoundments) and 78a.59c (centralized impoundments) are void and unenforceable owing to a lack of agency authority is DENIED.

4. Petitioner's request in Count V of the Petition for Review for a declaratory judgment that 25 Pa. Code § 78a.65(a)(1)(iv) is void and unenforceable owing to a lack of agency authority is DENIED.

5. Petitioner's request in Count V of the Petition for Review for a declaratory judgment that 25 Pa. Code § 78a.65(b) is void for vagueness is DENIED.

6. Petitioner's request in Count V of the Petition for Review for a declaratory judgment that 25 Pa. Code § 78a.65(d) is void and unenforceable due to a conflict with a statute or regulation is DENIED.

7. Petitioner's request in Count V of the Petition for Review for a declaratory judgment that 25 Pa. Code § 78a.65 is void and unenforceable for failure of the agency to follow proper procedures in promulgating the regulation is DENIED.

8. Petitioner's request in Count VII of the Petition for Review for a declaratory judgment that 25 Pa. Code § 78a.121(b) is void and unenforceable due to a conflict with a statute or regulation is DENIED.

In all other respects, Respondents' application is DENIED.


_____
P. KEVIN BROBSON, Judge